ROBERT JAMES HOFFMAN AND ALMA JEAN HOFFMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hoffman v. Commissioner
Docket No. 30350-84
United States Tax Court
T.C. Memo 1989-398; 1989 Tax Ct. Memo LEXIS 396; 57 T.C.M. (CCH) 1150; T.C.M. (RIA) 89398; July 31, 1989
Robert James Hoffman and Alma Jean Hoffman, pro sese. Steve Mather and Glorianne Gooding, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a statutory notice of deficiency dated May 25, 1984, determined deficiencies and additions to petitioners' 1980 and 1981 income taxes as follows: [1]Sec. 6653(b) Year
Deficiency
Addition to Tax
1980
$ 9,954.67 $ 5,411.34
1981
12,211.30
6,105.65  By an amended answer, respondent claimed increased income tax deficiencies and additions to tax as follows: Sec. 6653(b)
Year
Deficiency
Addition to Tax
1980
$ 11,375.10
$ 5,687.55 1981
$ 29,335.56
14,667.78  The issues presented for our consideration are: (1) Whether petitioners *398 had unreported income in 1980 and 1981 from the misappropriation of funds belonging to Mr. Hoffman's employer; (2) whether automobile expenses claimed by petitioners in 1980 are deductible as employee business expenses; (3) whether petitioners may deduct expenses claimed by their Subchapter S corporation for 1980 and 1981; (4) whether petitioners are liable for self-employment tax pursuant to section 1401; and (5) whether petitioners are subject to the addition to tax under section 6653(b). FINDINGS OF FACT The parties entered into stipulations of facts, with exhibits attached thereto, which are incorporated herein by this reference. Background
Petitioners, Robert James Hoffman (the use of petitioner in the singular refers to Robert James Hoffman) and Alma Jean Hoffman, husband and wife, resided in Arcadia, California, when the petition commencing this case was filed. Petitioners filed timely joint Federal income tax returns for the taxable years 1980 and 1981. On October 15, 1979, petitioner began his employment with Christina Securities, Inc., (firm or Securities). As more fully described below, Securities was a relatively small registered broker/dealer of securities *399 organized in 1979 by Christina Wertin (Christina) and her son John Wertin as a subsidiary corporation of Pacific Company, a corporation wholly owned by John Wertin. Petitioner's duties at the firm were numerous and varied. He had exclusive responsibility over the firm's "back office" functions, primarily bookkeeping and accounting. He was responsible for accepting and executing customers' buy and sell orders, accepting payment from customers (many times in cash) for the purchase of securities, crediting their accounts, and recording the purchases and resulting payments in the firm's books and records. In addition, petitioner was the "financial principal" of the firm charged with the obligation of preparing and filing the firm's monthly National Association of Securities Dealers (NASD) reports and assuring that the firm followed NASD and Securities and Exchange Commission (SEC) rules. Petitioner also served as treasurer and vice-president, and was a member of Securities' board of directors. During 1980 and 1981, petitioner's salary at Securities averaged approximately $ 2,400 per month, initially being paid with one paycheck per pay period. In addition to his 1980 salary, Securities *400 reimbursed petitioner in the amount of $ 4,606.01 for the expenses he incurred while commuting between his home and work. Petitioner was also able to receive interest-free and unsecured "loans" from Securities and its parent corporation. For example, on or about August 8, 1980, the Pacific Company "loaned" petitioners $ 12,000 for purposes of purchasing a condominium from one of John Wertin's companies. In addition, on or about September 30 and October 8, 1980, Securities gave petitioner two "loans" totaling $ 4,500. Christina organized Securities shortly after moving to San Clemente, California. Prior to her move, she had worked for a number of securities firms, acquiring extensive experience in the securities business. Christina was the firm's president, responsible for its "front office" functions. She was a stockbroker who was also in charge of the firm's sales department. Her salary at the firm ranged from approximately $ 1,300 to $ 1,800 per month. Securities conducted its business as a "self-clearing broker," a type of brokerage firm that performs all functions related to the purchase and sale of securities by customers. Such a firm initially pays for the securities *401 which it purchases on behalf of customers; receives payment from customers for the securities purchased; transfers securities to or from customers; and accounts for these transactions in its books and records. Self-clearing brokers require greater operating capital and record keeping capability as well as experts to handle various transactions. Consequently, self-clearing brokers incur more and greater expenses than those incurred by "introducing brokers," firms which receive buy and sell orders from customers but arrange for another firm, a clearing broker, to clear the transactions. A clearing broker receives payments from customers, issues confirmations, transfers stock, and maintains records of each transaction. The introducing broker and the clearing broker share the sales commission earned from each transaction. R. J. Hoffman & Co.
On May 2, 1980, petitioner incorporated R. J. Hoffman & Co., Inc. (Hoffman & Co.), a company wholly owned by petitioners that was purportedly in the financial consulting and bookkeeping business. From that point on, petitioner received two paychecks per pay period from Securities -- one denominated as petitioner's salary and the other *402 as a "consulting fee" that was issued to Hoffman & Co. Petitioner's duties at Securities did not change, only the method of compensation. The total amount of the two checks equalled the amount of the one salary check petitioner received previously. In addition, Hoffman & Co.'s sole client and only source of income during 1980 and 1981 was Securities. Petitioners were the only officers of Hoffman & Co., and as such, elected to have Hoffman & Co.'s Federal tax status be that of a "Small Business Corporation." As it reported on its Federal small business corporation income tax returns (Forms 1120S), Hoffman & Co. had gross income of $ 13,800 for 1980 and $ 19,696 for 1981, all derived from Securities as consulting fees. Hoffman & Co.'s "corporate headquarters" were purportedly located at petitioners' personal residence. The corporation paid for various personal living expenses of petitioners such as the rent on their residence, utilities, renter's/homeowner's insurance, life insurance, furniture and fixtures for petitioners' residence, repairs and improvements to the residence, medical expenses, automobile expenses, veterinary costs, and costs related to a pool table. Hoffman *403 & Co. reported these expenses as deductions on its 1980 and 1981 Form 1120S corporate income tax returns. Conversely, Hoffman & Co. reported that no compensation was paid to officers or anyone else. After taking into account its deductions, Hoffman & Co. reported taxable income in 1980 of $ 863 and a loss in 1981 of $ 13,166. Because Hoffman & Co. was a Subchapter S Small Business Corporation, the 1980 taxable income and 1981 loss were passed through and taken into account in petitioners' personal tax returns for 1980 and 1981, respectively. With these adjustments, petitioners reported taxable income of $ 10,973.60 and tax (before credits) of $ 868 for 1980 and taxable income of $ 3,512 and tax of $ 0 for 1981. Petitioner's Cash Diversion Scheme
On October 6, 1980, petitioner and Christina Wertin began renting safe deposit box number 482 at the Security Pacific National Bank. Petitioner and Christina each received keys to the box. Once the box was rented, petitioner, knowing it to be illegal, began to divert substantial amounts of cash received from Securities' customers. Petitioner organized the diverted money into numerous $ 1,000-packets, each bound by a paper clip. *404 He then placed the packets into loose envelopes, depositing them into the box. Petitioner maintained no other "record" regarding this activity. Petitioner diverted as much as approximately $ 50,000 to $ 60,000 from the firm during 1980 and 1981. Petitioner's actions had no business purpose, but were an attempt to permanently divest the firm of the diverted money. Mrs. Hoffman was aware of the diversion scheme. Petitioner entered the box virtually every month with as many as four visits a month. Between the date the box was first rented and the date of petitioner's last access on January 22, 1982, petitioner entered the box approximately 23 times. On one occasion when the box was first rented, Christina entered the box to deposit an envelope. The record does not disclose the contents of this envelope. Knowing that the diversion scheme was highly irregular and illegal, petitioner attempted to conceal his actions by "plugging numbers" into Securities' deficient accounts to balance the firm's books. Generally, the diversion scheme and its cover-up worked as follows. The firm purchased securities on behalf of its customers on credit or by using funds deposited in various firm *405 accounts. Within a few days of purchase, the customers reimbursed the firm (on numerous occasions in cash) for the securities purchased. Instead of properly accounting for the cash payments and depositing them into the business bank accounts, petitioner diverted and placed them into the safe deposit box, causing shortages in the firm's accounts. To cover up the deficiencies, petitioner plugged figures representing undeposited and nonexistent funds into the firm's books. At one point, petitioner fixed the books in advance to create a future balance in anticipation of future diversions. Although this maneuvering balanced the firm's books, the assets of the firm were being depleted. In a further attempt to conceal his actions, petitioner used unorthodox bookkeeping procedures and "maintained" the books and records of Securities in a disorderly fashion to cause confusion. On at least one occasion during August of 1981, the private auditors of Securities were unable to reconcile one of the firm's accounts which showed a deficiency of approximately $ 70,000. The difference between the records of Securities and third-party records was too great for the auditors to issue a clean opinion *406 on the audit. To "remedy" this problem and "confuse the auditors," petitioner caused Securities to issue an $ 80,000 check to him in the name of Hoffman & Co. Both petitioner and Christina signed the check. Petitioner used the check to purchase a $ 70,000 cashier's check. Petitioner deposited the cashier's check into the account the auditors could not reconcile. Petitioner deposited the remaining $ 10,000 into a Hoffman & Co. checking account. He then issued a $ 10,000 check from Hoffman & Co.'s account and deposited the check into the account from which the original $ 80,000 was withdrawn. The $ 70,000 deposit apparently satisfied the auditors and the matter was not further pursued. Petitioner was the only person to withdraw any of the diverted cash from the safe deposit box, and most of this money was used for petitioner's personal benefit. For example, on or about August 4, 1981, he withdrew $ 30,000; $ 26,900 was used as a down payment for the purchase of a residence found and co-brokered by Christina for petitioners. The remaining $ 3,100 was deposited into one of petitioner's bank accounts. On at least one occasion, some of the diverted funds were used for the benefit *407 of Christina Wertin. Christina's daughter needed money and upon Christina's request, petitioner wired approximately $ 3,000 of the diverted money to Christina's daughter's bank account. Petitioner continued to divert funds until October 1981 when the SEC and NASD started investigating Securities' record keeping practices. The SEC and NASD found that Securities' records were not maintained properly. Consequently, the SEC and the NASD imposed severe restrictions on the firm's business practices, including precluding it from receiving any funds from customers. As a result of these revelations, Securities terminated petitioner's employment on January 15, 1982. On January 22, 1982, petitioner entered the safe deposit box one last time. In June of 1982, the safe deposit box was drilled open and found to contain a $ 30,000 noninterest-bearing demand note from petitioner made payable to Christina Wertin and approximately $ 9,000 in cash. The note was dated August 3, 1981, approximately the same date petitioner withdrew the $ 30,000 from the box. Christina never asked for and petitioner never made any payments on the note. The $ 9,000 was apparently recovered by Securities. Because *408 petitioner diverted Securities' funds and used them to make personal securities purchases and sales, the NASD censured petitioner, barred him from associating with any NASD member, and fined him $ 40,000. In addition, Securities brought a civil suit against petitioner for the misappropriation of funds. Soon after petitioner was dismissed, Securities hired Liboslav Uhlir, a securities consultant, to review the firm's books and records and to put them in order so the SEC and NASD would lift the restrictions imposed. Mr. Uhlir converted the firm from a self-clearing brokerage firm to an introducing brokerage firm. Securities' business was then limited to accepting buy and sell orders from customers. Thereafter, no cash or securities would be held by Securities. The restructuring also reduced Securities' overhead by eliminating what was perceived by Mr. Uhlir as an unjustified and costly capability of a self-clearing brokerage. 1980 and 1981 Bank Deposits, Receipts and Tax Returns
During 1980, petitioners deposited a total of $ 53,786.26 into their four bank accounts. They deposited $ 12,080.37 representing their wages (after withholdings), $ 13,800 in gross receipts from *409 Hoffman & Co., $ 5,078.97 representing net income from their personal securities trades, $ 4,606.01 representing reimbursements for petitioner's commuting expenses, $ 1,790.10 in reimbursements for expenses petitioner incurred on behalf of the firm, and $ 828.29 representing a reimbursement for petitioner's costs in purchasing a T.V. set for Christina. In addition, the 1980 deposits reflect funds received from the following sources: medical insurance reimbursements totaling $ 4,412.45; and insurance premium refund of $ 171.25; a refund from petitioners' doctor of $ 100; and the proceeds from a $ 2,000 unsecured, noninterest-bearing "loan" received from Securities on or about October 8, 1980. The deposits also reflect inter/intra bank account transfers in the amount of $ 9,400.29. Separately and apparently not reflected in the deposited amount, petitioners received two additional loans and a cashier's check: a $ 2,500 "loan" from Securities on or about September 30, 1980; a $ 12,000 "loan" from The Pacific Company on or about August 8, 1980; and a $ 14,490 cashier's check. None of the diverted funds were deposited into petitioners' bank accounts in 1980. On their 1980 Federal *410 income tax return, petitioners reported $ 15,400 as wages from Securities, $ 815.72 as wages from petitioner's prior employer and $ 5,078.97 as net income from their personal securities trades. Petitioners also claimed $ 4,982.10 as automobile expenses and deducted this amount from their gross income. These expenses represented the same commuting expenses for which petitioner was reimbursed by Securities. Petitioners also reported $ 13,800 as corporate gross receipts on Hoffman & Co.'s 1980 Form 1120S. Petitioners did not report as income any funds petitioner diverted from Securities. During 1981, petitioners deposited $ 91,790.91 in their bank accounts, reflecting net wages of $ 7,627.20, net income from securities trades of $ 23,701, and gross receipts from petitioners' Subchapter S corporation of $ 19,696. In addition, petitioner deposited $ 3,100 of the $ 30,000 he withdrew from the safe deposit box. The remaining $ 26,900 was used as a down payment for the purchase of petitioners' home. Thus, petitioners' total 1981 deposits and receipts equalled $ 118,690.91. The 1981 deposited amounts also reflect funds from nontaxable interbank account and intrabank account transfers *411 totaling $ 32,665. [2]
On their 1981 Federal income tax return, petitioners reported $ 9,600 in wages from Securities, and $ 23,701 apparently representing net income from petitioners' personal securities trades. Petitioners also reported $ 19,696 as corporate gross receipts on Hoffman & Co.'s 1981 Form 1120S. Petitioners did not report as income any of the funds diverted from Securities. Respondent's Determination
On May 25, 1984, respondent issued a statutory notice of deficiency to petitioners regarding their 1980 and 1981 taxable years. Respondent determined that petitioners had unreported income of *412 $ 20,711 in 1980 and $ 25,890 in 1981. Respondent's explanation for his determination was as follows: In the absence of adequate records, your taxable income for the taxable years 1980 and 1981 has been computed by reference to bank deposits and cash payments plus personal other nondeductible expenditures. Therefore, your taxable income has been increased $ 20,711 for taxable year 1980 and $ 25,890 for taxable year 1981. In addition, respondent disallowed petitioners' 1980 automobile expense deduction in the amount of $ 4,982. Respondent also disallowed a claimed $ 13,166 loss incurred by Hoffman & Co. and passed through to petitioners in 1981. These adjustments, plus others which have been compromised by the parties, resulted in revised taxable income of $ 41,586.60 for 1980 and $ 40,568 for 1981. OPINION Burden of Proof
We must first address the preliminary and somewhat complex matter in the setting of this case of which party bears the burden of proof with respect to each issue. [3]
*413 1. Legal Standard. Generally, a taxpayer has the burden of proving that the Commissioner's determination in the notice of deficiency is in error. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). It is also well settled that respondent's determination is ordinarily afforded a presumption of correctness and the burden of going forward with the evidence rests with the taxpayer. Welch v. Helvering, supra; Dellacroce v. Commissioner, 83 T.C. 269, 279-280 (1984); Rule 142(a). We normally do not look behind the notice of deficiency to examine the basis for the Commissioner's determination or the propriety of his motives or administrative policies or procedures in making the determinations reflected in the notice. Jackson v. Commissioner, 73 T.C. 394, 400 (1979); see also Crowther v. Commissioner, 269 F.2d 292, 293 (9th Cir. 1959), affg. on this issue 28 T.C. 1293, 1301 (1957); Petzoldt v. Commissioner, 92 T.C. 661, 687-688 (1989). In this regard, we have recognized that "the Commissioner's determination may often rest upon hearsay or other inadmissible *414 evidence, and we know of no rule of law calling for a review of the materials that were before the Commissioner in order to ascertain whether he relied upon improper evidence * * *." Rosano v. Commissioner, 46 T.C. 681, 687 (1966). The rationale for this rule is that a trial before this Court is a proceeding de novo; our determination of a petitioner's tax liability must be based on the merits of the case and not on any previous record developed at the administrative level. Jackson v. Commissioner, supra; Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974). We have recognized a limited exception to this general rule in cases involving unreported illegal income where respondent fails to introduce any substantive evidence but rests on the presumption of correctness afforded the notice, and the taxpayer challenges the notice of deficiency on the grounds that it was arbitrary (i.e., without rational foundation in fact and based upon unsupported assumptions) and excessive within the rule of *415 Helvering v. Taylor, 293 U.S. 507 (1935). Jackson v. Commissioner, supra at 401; Human Engineering Institute v. Commissioner, 61 T.C. 61, 66 (1973), appeal dismissed (6th Cir., April 1, 1975), cert. denied sub nom. Kopas v. Commissioner, 423 U.S. 860 (1975). See also Llorente v. Commissioner, 649 F.2d 152 (2d Cir. 1981), revg. in part and affg. in part 74 T.C. 260 (1980); Petzoldt v. Commissioner, supra;Dellacroce v. Commissioner, supra.A showing that the deficiency notice is arbitrary and excessive and, therefore, not entitled to the usual presumption of correctness shifts the burden of going forward with the evidence to respondent. Llorente v. Commissioner, 74 T.C. at 264; Jackson v. Commissioner, supra, at 401; Greenberg's Express, Inc. v. Commissioner, supra.Such a showing however does not shift the burden of proof -- it remains with the taxpayer. *416 Welch v. Helvering, supra;Dellacroce v. Commissioner, supra at 287; Jackson v. Commissioner, supra.Accord United States v. Rexach, 482 F.2d 10, 16 (1st Cir. 1973), cert. denied 414 U.S. 1039 (1973). Where the taxpayer has conceded that he or she received the purported illegal income, we have not required that the Commissioner produce evidence linking the taxpayer to the income-producing activity. In Tokarski v. Commissioner, 87 T.C. 74, 76-77 (1986), we stated: In the instant case, however, there is no question that petitioner received $ 30,000 in 1981. Under these circumstances, we hold that there is no requirement that respondent produce evidence linking petitioner to an income-producing activity as a precondition to requiring petitioner to meet his burden of proof. * * * [Fn. ref. omitted.] Courts differ on whether the burdens of production and/or persuasion shift to respondent when his determination loses its presumption of correctness. The instant case is appealable to the Court of Appeals for the Ninth Circuit, and we will apply the standard enunciated by that *417 court. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The Ninth Circuit has held that in order for a presumption of correctness to attach to the statutory notice in unreported income cases (particularly with respect to alleged unreported income derived from illegal sources), respondent must come forward with substantive evidence establishing a "minimal evidentiary foundation" linking the taxpayer to the income-producing activity, Weimerskirch v. Commissioner, 596 F.2d 358, 361, 362 (9th Cir. 1979), revg. 67 T.C. 672 (1977), or "demonstrating that the taxpayer received unreported income." Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1979), affg. a Memorandum Opinion of this Court. See also Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985). This standard is applied even if the taxpayer has not made a showing that the notice is arbitrary. Weimerskirch v. Commissioner, supra at 361. If respondent's unreported income determination is not supported by the proper foundation, the determination is "clearly arbitrary and *418 erroneous." Weimerskirch v. Commissioner, supra at 362. The Ninth Circuit has reasoned that "When the Commissioner attempts to include unreported income, the Commissioner should have the burden of proving his case 'because the taxpayer may face practical difficulties in attempting to refute the Commissioner's assertion that the taxpayer received unreported income.'" Karme v. Commissioner, 673 F.2d 1062, 1065 (9th Cir. 1982), affg. 73 T.C. 1163 (1980), quoting Rockwell v. Commissioner, 512 F.2d 882, 886 (9th Cir. 1975). Once the Commissioner has carried his initial burden of introducing "some evidence linking the taxpayer with income-producing activity, the burden shifts to the taxpayer to rebut the presumption by establishing by a preponderance of the evidence that the deficiency determination is arbitrary or erroneous." Rapp v. Commissioner, supra.
Conversely, where the disallowance of deductions is involved, the ultimate burden of proof remains with the taxpayer. *419 Keogh v. Commissioner, 713 F.2d 496, 501 (9th Cir. 1983), affg. a Memorandum Opinion of this Court. The presumption in favor of the Commissioner is a procedural device which requires the taxpayer to come forward with enough evidence to support a finding contrary to the Commissioner's determination. * * * The burden of proof is yet another hurdle. After satisfying the procedural burden of producing evidence to rebut the presumption in favor of the Commissioner, the taxpayer must still carry his ultimate burden of proof or persuasion. * * * [Rockwell v. Commissioner, supra at 885 (Citations omitted.); see also Karme v. Commissioner, 673 F.2d 1062, 1065 (9th Cir. 1982), affg. 73 T.C. 1163 (1980).] 2. The Notice of Deficiency - Presumption of Correctness. Applying these standards to this case, initially we find that respondent has presented sufficient substantive evidence linking petitioner to the income producing activity and demonstrating that petitioner received unreported income. Through petitioner's testimony, respondent has shown that petitioner diverted substantial amounts of money (as much *420 as $ 50,000 to $ 60,000) from Securities in 1980 and 1981 with an intent to permanently divest the firm of those funds. The connection between petitioner and the income-producing activity is sufficiently acknowledged to permit the presumption of correctness to attach to the Commissioner's determination. See Rapp v. Commissioner, supra; see also Tokarski v. Commissioner, supra at 76-77. Respondent also established that most of the diverted money inured to petitioner's personal benefit. In this regard, respondent offered the testimony of Christina Wertin, John Wertin and Liboslav Uhlir which support respondent's contention that petitioner was involved in an embezzlement scheme. Therefore, the notice of deficiency is entitled to a presumption of correctness and petitioners have the burden of proving by a preponderance of the evidence that respondent's determination is arbitrary or erroneous. Respondent, in the notice of deficiency, determined that petitioners were liable for a tax deficiency of $ 9,954.67 for 1980 and $ 12,211.30 for 1981. Respondent determined the 1980 deficiency primarily based on $ 20,711 of unreported income, $ 4,982 *421 of disallowed employee business expenses and self-employment tax of $ 784.43. Respondent determined the 1981 deficiency primarily based on $ 25,890 of unreported income, a disallowed flow-through loss of $ 13,166 purportedly incurred by petitioners' Subchapter S corporation and self-employment tax of $ 1,869.30. 3. The Amended Answer - Increased Deficiency. By an amended answer, respondent asserted increased total income tax deficiencies of $ 11,375.10 for 1980 and $ 29,335.56 for 1981. Respondent based the increased 1980 deficiency on unreported embezzlement income of $ 16,691.63, disallowed employee business expense deductions of $ 4,982 and disallowed pass-through deductions from petitioners' Subchapter S corporation of $ 12,317. Respondent based the increased 1981 deficiency on unreported embezzlement income of $ 45,871.71 and disallowed pass-through Subchapter S deductions of $ 31,877. On brief, respondent has conceded that the unreported embezzlement income should be in the lesser amounts of $ 9,689.19 and $ 45,271.71 for 1980 and 1981, respectively. 4. Items at Issue - Burden of Proof. With respect to 1980, because respondent determined in the notice of *422 deficiency that petitioners had unreported income, even though the amount was subsequently reduced in the amended answer and further reduced to $ 9,689.19 in respondent's brief, respondent's determination is presumptively correct. See Commissioner v. Estate of Leyman, 344 F.2d 763 (6th Cir. 1965), vacated on other grounds 383 U.S. 832 (1966). In order to overcome the presumption, petitioners bear the burden of proving by a preponderance of the evidence that respondent's determination that they had unreported income of $ 9,689.19 was erroneous. With respect to the disallowed employee business expense deduction for 1980 of $ 4,982 and the self-employment tax of $ 784.43, petitioners bear the burden of proof because they were determined in the notice of deficiency. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Rockwell v. Commissioner, supra. Conversely, because respondent first asserted in the amended answer that the Subchapter S deductions were not allowable for 1980, respondent bears the burden of proving the nondeductibility of those deductions. Rule 142(a). With respect to 1981, respondent determined *423 in the notice of deficiency that petitioners had $ 25,890 in unreported income. Respondent now asserts that petitioners had unreported income in the amount of $ 45,271.71. Respondent's initial determination is presumed correct and petitioners have the burden of overcoming this presumption by establishing that the determination is erroneous. However, because the increased amount of unreported income for 1981 first appears in the amended answer, respondent bears the burden of proof on the items that would increase the deficiency determined in the notice. Rule 142(a). With respect to petitioners' Subchapter S corporation for 1981, respondent determined that petitioners were not entitled to the pass-through loss deduction because petitioners did not establish that the loss was sustained. Alternatively, respondent determined the loss did not originate from a qualified small business corporation. Respondent now concedes that the corporation was a qualified small business corporation. Respondent claimed in his amended answer and during trial that the corporation's deductions represent petitioners' personal living expenses and, therefore, are not deductible. *424 The issue now is not a matter of substantiation, but whether the expenses are properly deductible. This approach generates a new matter and increased deficiency under Rule 142(a). Estate of Falese v. Commissioner, 58 T.C. 895, 898-899 (1972). Consequently, respondent bears the burden of proving that the amounts claimed are not deductible. With respect to the 1981 self-employment tax determination, petitioners bear the burden of proving they are not subject to that tax. Rule 142(a). Finally, respondent bears the burden of proof on whether petitioners are liable for the section 6653(b) addition to tax. Sec. 7454(a); Rule 142(b). We now turn to the substantive issues presented for our consideration. The Unreported Income Issue
Respondent, in the notice of deficiency, calculated petitioners' unreported income by the following method: (1) Adding together petitioners' bank deposits and undeposited receipts; (2) subtracting petitioners' nontaxable deposits and receipts; and (3) subtracting gross income reported on petitioners' individual and corporate returns. The remainder constituted the determined unreported taxable income. In his answer to the petition, *425 respondent identified the source of the unreported income as petitioner's embezzlement activity at Securities. Petitioners make the following arguments in support of their contention that they did not have unreported taxable income for either 1980 or 1981: (1) That the embezzled funds should not be charged to petitioners as income because petitioner acted as agent of Christina in diverting the funds; (2) that respondent was unjustified in computing their income by means of the bank deposits method; and (3) that in implementing the bank deposits method, respondent failed to fully take into account the receipt and/or deposit of funds from nontaxable sources. 1. Whether the Embezzled Funds Are Income to Petitioners. The language of section 61, "all income from whatever source derived," has been held to encompass within the definition of gross income all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). Gross income includes funds derived from legal and illegal sources. *426 Rutkin v. United States, 343 U.S. 130 (1952). In a case involving the embezzlement of funds by a union official, the Supreme Court held that amounts received "without the consensual recognition, express or implied, of an obligation to repay, and without restriction as to their disposition" constitute income to the recipient "even though he may still be * * * adjudged liable to restore its equivalent. * * * This standard brings wrongful appropriations within the broad sweep of 'gross income' * * *." James v. United States, 366 U.S. 213, 219 (1961). A gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." Rutkin v. United States, 343 U.S. 130, 137 (1952). It is the economic benefit accruing to the taxpayer that is the controlling factor in determining whether a particular gain is "income." Commissioner v. Glenshaw Glass Co., supra.
In the instant case, petitioner exercised "complete dominion" over the diverted funds within the meaning of Glenshaw Glass as evidenced by the following: 1. He obtained physical *427 possession of the funds from customers and intentionally diverted them from Securities knowing that doing so was illegal. 2. He attempted to hide his actions by plugging numbers into the books and records of Securities. 3. By virtue of renting the safe deposit box and possessing its key, he had unfettered physical access to the funds after he placed them in the safe deposit box. 4. He had the ability to, and actually did, divert funds to his own use. Petitioner does not dispute that the funds at issue were embezzled. He claims, however, that he was the "mule" for and agent of Christina and, therefore, the embezzled funds should not be chargeable to him as income. He further argues that the funds he converted to his own use were in the form of a "loan" from Christina, as evidenced by the $ 30,000 note found in the safe deposit box. Petitioner points to the following facts to support his claims: 1. The safe deposit box was in the name of both petitioner and Christina and both received keys to the box. 2. Christina made at least one trip to the box to deposit an envelope. 3. Christina received a smaller salary from the firm than petitioner although she organized the *428 firm and was its president. (Allegedly Christina was using the diverted funds to supplement her salary, thereby paying lower taxes attributable to salary.) 4. Approximately $ 3,000 of the diverted funds were used to benefit Christina's daughter. 5. Christina signed the $ 80,000 check which was used to "balance" an account under audit by the firm's private auditors. 6. Christina had extensive experience in the securities business. 7. Christina unjustifiably structured Securities as a "self-clearing" brokerage firm. Consequently, Christina had the opportunity to acquire possession of cash (allegedly making it available for embezzlement purposes). 8. Christina was a co-broker on the house to the purchase of which petitioners applied $ 26,900 of the diverted funds as a down payment. 9. Christina, as president of Securities, was willing to give petitioner unsecured, noninterest-bearing loans. After looking beyond the labels petitioner uses to describe his actions in this case, we do not agree with petitioner's characterization of his role in the embezzlement scheme. In *429 Geiger's Estate v. Commissioner, 352 F.2d 221, 231-232 (8th Cir. 1965), affg. a Memorandum Opinion of this Court, involving somewhat similar facts, the taxpayer/bank employee argued that the funds being embezzled from the bank flowed directly from the bank to the depositor/beneficiaries of the fictitious deposits and did not pass through the embezzler's hands. The court responded as follows: That may be one way to describe it. Another, equally valid, is that the funds came to [the embezzler] and were passed out or made available by her to the beneficiaries. These beneficiaries were the objects of her bounty, not the bank's. She was the force and the fulcrum which made those benefits possible. She assumed unto herself actual command over the funds. This is enough. Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930). We are not sympathetic with the claim that, because she may not have used the funds for personal needs, she is not to be taxed. She enjoyed benefits of a kind which obviously must have loomed large in her mind and have been important to her -- status as the beneficent donor to good causes and favored acquaintances, *430 a reputation as an available friend in need, the acquisition, with respect to a "loan", of the resulting obligation to her, and the like. Helvering v. Horst, [311 U.S. 112, 116-117 (1940)]. It would be ironical to hold otherwise. See also Bailey v. Commissioner, 52 T.C. 115, 118-119 (1969), affd. 420 F.2d 777 (5th Cir. 1969); People v. Pierce, 110 Cal. App. 2d 598, 243 P.2d 585, 592 (1952) ("Any diversion of funds held in trust constitutes embezzlement whether there is direct personal benefit or not as long as the owner is deprived of his money. People v. Talbot, 220 Cal. 3, 28 P.2d 1057; People v. Braiker, 61 Cal. App. 2d 406, 143 P.2d 89."). The facts in this case establish that petitioner's interest in the diverted funds was more than that of an agent or borrower. Petitioner was the dominant if not the exclusive operative force behind the embezzlement scheme. He received the funds from the firm's customers and he personally deposited them in the safe deposit box. In addition, petitioner implemented various sophisticated techniques to conceal his admittedly illegal acts from *431 the firm's private auditors. He plugged in numbers to force the firm's books into balance. He also fixed the books in such a manner as to allow future diversions of cash without the need to continuously "balance" the books with each diversion. More importantly, most of the funds diverted were converted to petitioner's own benefit. Petitioner withdrew $ 30,000 of the diverted funds from the box, $ 26,900 of which was used as a down payment on the purchase of petitioners' home, and the remaining $ 3,100 was deposited into petitioners' bank accounts. Petitioners' contention that the $ 30,000 was a loan from Christina as evidenced by the $ 30,000 note found in the box does not strengthen his case. Respondent argues that the note was planted in the box on January 22, 1982, petitioner's last visit to the box after the NASD and the SEC started their investigation and after Securities terminated petitioner's employment. Respondent relies on Christina's testimony that she had no knowledge of the embezzlement scheme or the $ 30,000 note, and therefore implies that the note was another attempt by petitioner to cover up his embezzlement activity. We find that the $ 30,000 petitioner withdrew *432 from the box was not a bona fide loan. The note was intended to give petitioner's involvement in this scheme an appearance of legitimacy. We are convinced of this regardless of whether the note was placed in the box at the time petitioner withdrew the $ 30,000 or after petitioner's employment was terminated and the SEC and NASD got involved. The magnitude of petitioner's efforts in the diversion scheme and in concealing his actions persuades us that his interest in the funds was not merely that of a potential borrower or agent. This is further supported by the fact that Christina did not request and petitioner never made any payments on the note. Moreover, the suit Securities filed against petitioner for misappropriation of funds indicates that petitioner was not an agent of Christina or a borrower of the diverted funds. See Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. a Memorandum Opinion of this Court. We therefore find that petitioner's claim that he was an agent or borrower as to the embezzled money incredible. Even if Christina knew of and benefited from petitioner's diversion of funds, our conclusions would not change. *433 The funds would still be income to petitioners. Petitioner testified that he and Christina "agreed" to divert the firm's money into the safe deposit box. However, petitioner further testified he received substantial benefits in return for his actions such as the unrestricted ability to withdraw unsecured, noninterest-bearing "loans" and the security of continued employment. Consequently, he was "the force and the fulcrum which made those benefits possible." Geiger's Estate v. Commissioner, supra.We therefore conclude that as a result of petitioner's unlimited control over the diverted funds, petitioner recognized "readily realizable economic value" rendering those funds taxable income to petitioners. 2. Whether Respondent Was Justified in Using the Bank Deposits Method. It has long been settled that where a taxpayer has no records or inadequate records, respondent is entitled to use other reasonable methods of determining his income. Holland v. United States, 348 U.S. 121 (1954). The bank deposits method has been recognized as a reasonable method to be used in computing a taxpayer's income. *434 Traum v. Commissioner, 237 F.2d 277 (7th Cir. 1956), affg. a Memorandum Opinion of this Court; Cupp v. Commissioner, 65 T.C. 68, 82 (1975), affd. without opinion 559 F.2d 1207 (3d Cir. 1977); Romer v. Commissioner, 28 T.C. 1228, 1244 (1957). The record here supports a finding that petitioners maintained no books and records with respect to petitioner's embezzlement or misappropriation of funds from Securities. Petitioner, at trial, was able to provide a rough estimate of $ 50,000 to $ 60,000 as the amount he took from the firm. Moreover, petitioner testified that once he was terminated from the firm he no longer had access to his books and records and those belonging to the firm. Further, petitioner intentionally muddied the firm's records to reduce the possibility of tracing his activity. According to petitioner, his lack of records forced him to calculate his taxable income and prepare his returns by indirect means. We hold that respondent properly used the bank deposits method to compute petitioners' taxable income and his determination, as stated in the notice of deficiency, is presumptively correct. Therefore, *435 it is incumbent upon petitioner to show error in that determination. 3. Whether Respondent Failed to Account for Nontaxable Sources of Deposits and Receipts. Petitioners next take issue with the method respondent used to calculate the amount of unreported income petitioners had in 1980 and 1981. They argue that respondent's unreported income determination under the bank deposits/undeposited receipts method is erroneous because respondent did not account fully for the deposits and receipts derived from nontaxable sources. However, the question here is not whether petitioners have shown that respondent's method was imprecise, but rather the question is whether petitioners have shown that respondent's determination was excessive. To overcome the presumption of correctness afforded respondent's determination, petitioners have the burden of proving that the deficiency is arbitrary or excessive. Helvering v. Taylor, 293 U.S. 507 (1935); Rapp v. Commissioner, 774 F.2d 932 (9th Cir. 1985); *436 Herbert v. Commissioner, 377 F.2d 65 (9th Cir. 1966), revg. a Memorandum Opinion of this Court. Petitioners do not contend that respondent's determination is arbitrary, and we cannot see how respondent's determination is rendered erroneous or excessive in light of evidence establishing the actual receipt of the unreported income. As we noted above, respondent reconstructed petitioners' unreported income by analyzing petitioners' deposits and undeposited receipts. While petitioners may have refuted the bank deposits portion of the analysis, primarily for 1980, they admittedly had undeposited embezzlement receipts in amounts sufficient to sustain respondent's determination. [4]
In Helvering v. Taylor, supra, the Supreme Court held against the Commissioner when the taxpayer had shown both that the Commissioner's notice of deficiency was incorrect and that the Commissioner's error resulted in a determination of a greater tax liability than the taxpayer's true tax liability, i.e., that respondent's determination *437 was "excessive." The Court concluded as follows: Unquestionably the burden of proof is on the taxpayer to show that the commissioner's determination is invalid. * * * Frequently, if not quite generally, evidence adequate to overthrow the commissioner's finding is also sufficient to show the correct amount, if any, that is due. * * * But, where as in this case the taxpayer's evidence shows the commissioner's determination to be arbitrary and excessive, it may not reasonably be held that he is bound to pay a tax that confessedly he does not owe, unless his evidence was sufficient also to establish the correct amount that lawfully might be charged against him. * * * [Citations omitted; 293 U.S. at 515.] We had the opportunity to explore this issue in Giddio v. Commissioner, 54 T.C. 1530, 1534 (1970), as follows: In Estate of Peter Finder, 37 T.C. 411, 423 (1961), the Commissioner assigned erroneous reasons for the disallowance of a deduction for depreciation, yet the burden of proof remained with the taxpayer. See also *438 Angellino v. Commissioner, 302 F.2d 797 (C.A. 3, 1962), affirming on this point a Memorandum Opinion of this Court. In all of these cases the accuracy of the determination rather than the method of computation was the controlling factor in determining the validity and effect of the notice of deficiency. Indeed, in Rouss v. Bowers, supra [30 F.2d 628] at 630, the court said that even "assuming * * * the Commissioner's method was arbitrary, this cannot avail * * * [petitioner] in the absence of any showing that it resulted in an erroneous assessment." See also Bishoff v. Commissioner, supra [27 F.2d 91] at 93. To place the burden of proof on respondent, as to the amount of the taxable income, therefore, we think petitioner was required to show that respondent's determination was excessive. [See also United States v. Janis, 428 U.S. 433, 441 (1976); Llorente v. Commissioner, 74 T.C. 260, 278 n. 7 (1980).] Here, petitioner admits, and we cannot close our eyes to the fact, that he illegally misappropriated as much as $ 50,000 to $ 60,000 from Securities between October of 1980 and October of 1981. With respect to *439 respondent's determination that petitioners had unreported income of $ 9,689.19 in 1980, petitioners have neither argued that less than $ 9,689.19 was diverted in 1980 nor presented any evidence disputing respondent's determination that $ 9,689.19 was diverted in 1980. Petitioners have therefore failed to overcome the presumption that respondent's determination is correct. With respect to 1981, respondent determined in the notice of deficiency that petitioner had $ 25,890 of unreported income. In his amended answer, respondent increased his unreported income determination to $ 45,271.71. Considering respondent's initial determination first, petitioners have the burden of proving that respondent's determination is erroneous. As was the case for 1980, petitioners have not presented evidence indicating that they diverted less than $ 25,890 in 1981. Therefore, respondent's determination, as set out in the notice of deficiency, is sustained. With respect to the increased amount for 1981, respondent is not entitled to a presumption of correctness. Therefore, it is incumbent upon respondent to prove the facts supporting the increase. We find that respondent has met his burden for *440 a portion of the increase. Through petitioner's testimony, respondent has shown that as much as $ 50,000 was systematically embezzled by petitioner in the 13-month period from October of 1980 to October of 1981. After considering all the nontaxable sources of petitioners' deposits and receipts for 1981, petitioners had "unexplained" deposits and receipts of $ 35,001.71 which one can reasonably infer are attributable to petitioner's embezzlement scheme. Hence, we hold that petitioners had unreported embezzlement income in 1981 of $ 35,001.71. Because we have already sustained respondent's original 1981 deficiency determination in the amount of $ 25,890, we find that respondent has proven that petitioners failed to report an additional $ 9,111.71 of embezzlement income. [5]
The Automobile Expense Issue
Respondent disallowed an employee automobile business expense deduction of $ 4,982. Deductions are a matter of legislative grace and entitlement thereto must be shown by the taxpayer. *441 New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). The taxpayer bears the burden of proving that respondent's determination is in error. Welch v. Helvering, 290 U.S. 111 (1933); Rockwell v. Commissioner, 512 F.2d 882 (9th Cir. 1975); Rule 142(a). Petitioners offered no credible evidence to substantiate their entitlement to the automobile expense deduction disallowed by respondent. In fact, the record establishes that the only automobile expenses incurred by petitioner with respect to his employment involved his commute between his home and place of work. These expenses are personal and not deductible. Sec. 262; Commissioner v. Flowers, 326 U.S. 465, 473-474 (1946); Hynes v. Commissioner, 74 T.C. 1266, 1295-1296 (1980); see also secs. 1.162-2(e) and 1.262-1(b)(5), Income Tax Regs. In addition, petitioner was monetarily compensated by Securities for these expenses and is therefore not entitled to claim them as deductions. Podems v. Commissioner, 24 T.C. 21 (1955). See also *442 Leamy v. Commissioner, 85 T.C. 798, 810 (1985). Even assuming petitioner incurred automobile expenses, he has failed to submit any evidence indicating how much of his expenses is deductible and that he could not have been reimbursed by Securities for his expenses. Leamy v. Commissioner, supra.We sustain the Commissioner's determination on this issue. Business Expense Deductions of Hoffman & Co. A taxpayer may deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business. Sec. 162(a). If the expense was incurred for a business purpose that bears a reasonably close relationship to the taxpayer's trade or business, it will be properly deductible. Commissioner v. Heninger, 320 U.S. 467 (1943). No deduction, however, is allowable for personal, living, or family expenses. Sec. 262. The record in this case establishes that the expenses "incurred" by Hoffman & Co. were the personal expenses of petitioners that did not have any business purpose. Petitioners attempted to convert their personal living expenses into deductible business expenses by having Securities pay petitioner's salary with two separate *443 checks. One of those checks was issued to Hoffman & Co. from which petitioners paid their personal expenses. In our opinion, there was no business purpose for this arrangement or for the creation of Hoffman & Co. Petitioner's duties at Securities did not change once Hoffman & Co. was organized and Securities was Hoffman & Co.'s only client. See Factor v. Commissioner, 281 F.2d 100 (9th Cir. 1960). Petitioners intended to convert nondeductible personal expenses into deductible business expenses of their wholly owned Subchapter S corporation. Something that seems too good to be true usually is, and this case is no exception. Moreover, even if the corporation could deduct such expenses, payment by the corporation of petitioners' expenses would constitute taxable income to petitioners. Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929). It is also apparent from the record that Securities reimbursed petitioner for any expenses he incurred that were related to his employment. Accordingly, we find that the deductions claimed by Hoffman & Co. in 1980 and 1981 are not allowable except to the extent that the parties have stipulated otherwise. *444 The Self-Employment Tax Issue
Respondent determined that petitioners were liable for the self-employment tax under section 1401 for 1980 and 1981. Respondent determined the tax based upon that portion of petitioner's salary paid by Securities to Hoffman & Co. [6]Section 1401 imposes a social security tax upon an individual earning income from a trade or business, but not where the services he renders are performed as an employee. Sec. 1402; Rosano v. Commissioner, 46 T.C. 681, 689 (1966). Although neither party addressed this issue during trial or on brief, we find petitioners are not liable for the self-employment tax. As we have detailed in our findings, petitioner was employed by Securities during 1980 and 1981. Petitioner did not conduct any trade or business through Hoffman & Co., but instead used that "entity" as a means to create improper tax deductions. Any additional social security tax was the responsibility of Securities, petitioner's true employer. Therefore, we find that because petitioner was not self-employed with *445 respect to his services performed for Securities, petitioners are not liable for the determined self-employment tax. Section 6653(b) Fraud Addition
Respondent determined that petitioners were liable for additions to tax under section 6653(b) for fraudulently understating their income in 1980 and 1981. Section 6653(b) provides that if any part of the underpayment is due to fraud, there will be an addition to tax equal to 50 percent of the entire underpayment. Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958); Estate of Pittard v. Commissioner, 69 T.C. 391 (1977). Respondent has the burden of proving by clear and convincing evidence that an underpayment exists for the years in issue and that some portion of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that petitioners intended to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of taxes. *446 Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment of tax for each year in issue is attributable to fraud. Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner, supra. Fraud is not to be imputed or presumed, but rather must be established by some independent evidence of fraudulent intent. *447 Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969). However, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, supra; Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, supra at 499. Courts have relied on a number of indicia of fraud in deciding section 6653(b) cases. Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence of fraud. *448 Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam a Memorandum Opinion of this Court; Beaver v. Commissioner, supra at 93. In Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. a Memorandum Opinion of this Court, the Ninth Circuit Court of Appeals gave a nonexclusive list of circumstantial evidence which may give rise to a finding of fraudulent intent. Such "badges of fraud" would include: (1) Understatement of income; (2) maintenance of inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; and (6) failure to cooperate with tax authorities. The Ninth Circuit in Bradford further stated that the existence of the following facts supported our finding of fraudulent intent: (1) The taxpayer's engaging in an illegal activity; (2) his attempt to conceal such activity; (3) his dealing in cash; and (4) his failing to make estimated tax payments. A pattern of underreporting income over an extended period of time is indicative of fraud. *449 Foster v. Commissioner, 391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue a Memorandum Opinion of this Court; Brooks v. Commissioner, 82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Respondent cannot rely on the taxpayer's failure to prove error in respondent's determination to meet his burden of proving fraud. Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982); Otsuki v. Commissioner, supra at 106; Pigman v. Commissioner, 31 T.C. 356, 370 (1958). After examining the record in this case, we conclude that petitioners intended to evade taxes which they knew they owed, by conduct intended to conceal, mislead and prevent the collection of taxes. Petitioner admitted that he, knowing it to be illegal, diverted as much as $ 50,000 to $ 60,000 from Securities during 1980 and 1981, and Mrs. Hoffman had full knowledge of this illegal activity. The embezzlement of these funds was the predominant cause for the underpayment of tax in both years at issue. Petitioner argues that he acted as the agent for Christina in this unlawful scheme. The facts *450 in this case do not support this claim; instead they are in support of our finding of fraud. As we have detailed in our findings, petitioner was the primary, if not the only, character carrying out the embezzlement scheme. He went to extreme lengths to conceal his actions from the firm's auditors and was at least the primary beneficiary of the embezzled funds. The extent to which petitioner was involved in the illegal income-producing activity and the extent to which he and his wife personally benefited from that activity makes petitioner's explanations for his behavior implausible or inconsistent. See Bradford v. Commissioner, supra.Moreover, the fact that the unreported income here was derived from an illegal activity which petitioner attempted to conceal from persons other than his wife, is another circumstance which may be considered in the overall evaluation of petitioners' fraudulent intent. Bradford v. Commissioner, supra.In McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. *451 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976), we stated: While evidence that a taxpayer was attempting to defraud another in a business transaction may not be direct evidence of fraud with intent to evade tax * * *, the Court is entitled to consider such evidence along with other evidence in determining the intent of the taxpayer in doing certain acts, because it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax. * * * Petitioners' failure to maintain or present records to respondent's agents is additional evidence of an attempt to conceal income and manifests an intent not to pay the tax. Grosshandler v. Commissioner, 75 T.C. 1 (1980). In addition to the foregoing indicia of fraud, petitioners' intent is further revealed by the use of Hoffman & Co. to avoid payment of taxes. By use of a wholly owned corporation, petitioners improperly attempted to convert nondeductible personal expenses into deductible business expenses. *452 Finally, petitioners' fraudulent intent is evidenced by the fact that petitioners deducted nondeductible fully reimbursed commuting expenses. The evidence produced here clearly and convincingly proves petitioners' fraudulent intent to evade taxes for both 1980 and 1981. Accordingly, we find petitioners liable for the addition to tax under section 6653(b) for both years. Petitioners' Nontax Claims
Petitioners argue that they are entitled to actual damages (ostensibly from respondent) for the "INTENTIONAL ATTEMPTED EXTORTION by the I.R.S. from Us," punitive and exemplary damages "due to the FRAUDULENT, MALICIOUS and OPPRESSIVE Actions of the I.R.S. against Ourselves," and treble damages "due to the CONSPIRACY and COLLUSION of the I.R.S. with the GANG OF CRIMINALS in VIOLATION of the ANTI-RACKETEERING LAWS AS ESTABLISHED BY CONGRESS." Petitioners also request that we issue "an ORDER to COMPELL [sic] the I.R.S. to conduct an Investigation into the CRIMINAL Actions that We Know the CRIMINALS Have Committed." We find petitioners' vague request for damages in this case to be substanceless and without statutory basis for relief. To reflect the foregoing and concessions, *453 Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. As we discussed above, on Aug. 26, 1981, an $ 80,000 check was issued to Hoffman & Co. from Securities. With these funds, petitioner purchased a $ 70,000 cashier's check and deposited the cashier's check into one of the firm's accounts. The remaining $ 10,000 was deposited in Hoffman & Co.'s bank account. Simultaneously, petitioner issued a $ 10,000 check from the corporate bank account and deposited this check into another account belonging to Securities. Without any dispute between the parties, the $ 10,000 transfer is considered an interaccount transfer.↩
3. Although basic and fundamental, this area of the law has been described as "a muddy track * * * [of] decided cases regarding the so-called presumption of correctness and its impact on the burden of proof and the burden of going forward with evidence." Llorente v. Commissioner, 74 T.C. 260, 280 (1980) (Tannenwald, J., concurring), affd. in part and revd. and remanded in part 649 F.2d 152↩ (2d Cir. 1981).
4. We also note that petitioners' failure to report $ 4,606.01 in taxable commuting reimbursements in 1980 supports respondent's determination.↩
5. We note that in 1982 approximately $ 9,000 remaining in the safe deposit box was withdrawn and/or recovered by Securities.↩
6. Respondent did not determine that the deficiency in self-employment tax was due to unreported embezzlement income.↩