ROBERT A. ELMORE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ALICE G. ELMORE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Elmore v. Commissioner
Docket Nos. 10463-82, 10464-82.[1]
United States Tax Court
T.C. Memo 1987-72; 1987 Tax Ct. Memo LEXIS 68; 53 T.C.M. (CCH) 70; T.C.M. (RIA) 87072; February 9, 1987. John R. Tisdale and Jimmy W. Mitchell, for the petitioners. Vallie C. Brooks, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in and additions to income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b) [2]
1975
$37,526.52
$18,763.26 1976
85,563.43
42,781.71
1977
116,039.00
58,019.50
We must decide the following: 1. Did petitioner Robert A. Elmore (Elmore) misappropriate funds from his employer during 1975, 1976, and 1977 for his own use? 2. Are petitioners liable for the fraud addition? 3. It petitioner *69 Alice G. Elmore (Mrs. Elmore) an innocent spouse under section 6013(e)? FINDINGS OF FACT To the extent stipulated, the facts are so found. Petitioners, husband and wife, resided in North Little Rock, Ark., when they filed their petitions in these cases. For each year in issue they filed joint Federal income tax returns with the Internal Revenue Service Center in Austin, Tex.
Elmore was employed by T.J. Raney & Sons, Inc. of Little Rock, Ark. (the Company) and its predecessors from 1959 until 1977. The Company was in the business of underwriting Arkansas state and local bonds and trading other securities, including equities and government bonds from around the country. Various Raney companies and partnerships were consolidated in 1975 and T.J. Raney & Sons, Inc. survived. Respondent alleges that Elmore embezzled $448.208 from his employer as follows: $92,559 in 1975, $160,712 in 1976, and $194,937 in 1977. Petitioners did not report these amounts on their income tax returns. Elmore admits he was involved in the misappropriation of funds, but asserts he acted at the direction of his supervisor, Robert W. Raney (also known as Bob Raney), the Company president. Elmore *70 claims all the money went to Bob Raney, some for Raney's personal benefit and some for payments to public officials to benefit the Company. Elmore denies he received anything. Elmore was hired in 1959 by Pete Raney, who told him, "Your job is to do what you are told to do and keep your mouth shut, and if you can't live with that we don't need you." Elmore reported to Pete Raney until Pete died in 1972, then to Bob Raney. During the years at issue Elmore was a cashier in the Company's Arkansas bond market transactions. He prepared checks (to be signed by others), made deposits, reconciled bank statements, opened mail related to bond deliveries, closed bond transactions, initiated paperwork for bond transactions from which entries were made into the Company's accounting system, and had charge of a petty-cash fund. In closing a bond issue, Elmore prepared payment documents, prepared and verified bonds, received and delivered bonds, and received and delivered payments to the bank. Elmore did not have authority to sign checks for the Company. Neither was he a registered sales representative qualified to make trades of securities for clients' accounts. Such trades could be executed *71 only by a registered sales representative. Bob Raney had check-signing authority and was a registered representative. From time to time Elmore performed "special" duties for Pete or Bob Raney. He once hauled a truckload of illegally killed ducks from the Raney clubhouse at Hazen, Ark., to a banker in Memphis. He picked up illegally killed quail in Missouri. He delivered several cases of whiskey to a motel in Jackson, Miss., where Pete was having a party for his quail-hunting companions. On one occasion Elmore delivered a cash payment of $20,000 to a public official. He was also aware that other payments were made to other officials. [3]
Elmore does not dispute the allegation that he "procured" approximately $448,000 by making false entries in the Company's books between 1975 and 1977, and we so find. [4]
The various improper accounting procedures began long before the years in issue with Pete Raney and continued under Bob Raney. False entries (such *72 as padding expenses connected with closing a new issue, checks to fictitious client accounts, and fraudulent bank invoices for nonexistent bank charges) were later converted into cash. Elmore put the cash in an envelope kept in a secret compartment of the Company's safe. He was told to keep at least $15,000 in the envelope. Pete or Bob Raney would instruct Elmore when to initiate the false bookkeeping entries to generate more cash. Elmore did not take money out of the envelope; this was done by Pete or Bob Raney. In addition to the cash fund, Elmore received bearer bonds purchased for the "Ila Long" account. Ila Long was a fictitious client.When he received them, Elmore put the bonds in an envelope and gave it to Bob Raney. Elmore did not keep the bonds for his personal use. He believed Bob Raney was accumulating the bonds in preparation for his divorce. Raney was in fact divorced in 1976. Elmore's special duties for Bob Raney continued until Elmore left the Company in December 1977. Under orders from his bosses, Elmore never discussed these activities with his wife. By the summar of 1977 Elmore was suffering severe health problems. The sheath of his spine was deteriorating. *73 In 1972 he had begun to go blind in his left eye and was diagnosed as having a brain tumor. After cobalt radiation in 1973 the tumor was apparently arrested, but Elmore continued to suffer various neurological problems. By 1977 his legs would sometimes collapse under him without warning. He became afraid to cross the street when delivering cartons of bearer bonds, sometimes worth millions of dollars, to banks. His wife began driving him from bank to bank, but she stopped when a bank employee complained about her presence. Finally, Elmore told Bob Raney in the summer of 1977 that he wanted to leave the Company at the end of the year. In November or December of 1977 Raney told Elmore the Company auditors were investigating the fund used for political payments. Since Elmore had planned to leave at the end of the year in any event, Raney asked him to take responsibility for the misappropriations. Raney promised to see that Elmore was not harmed. Because of his deep loyalty to Raney, and because of Raney's assurance that he would not lose any money, Elmore agreed. Without admitting he ever received the funds, Elmore acknowledged discrepanies in the accounts under his responsibility. *74 In December 1977 Elmore signed over his personal Company savings account, the "Raney account," [5] which had grown, mostly by accrued interest, from $5,000 to approximately $49,000, [6] "in settlement of claims against me as of this date." Both Elmore and Raney believed the $49,000 would end the investigation, satisfy the SEC and save the Company from ruin. It would also make Raney appear to be looking out for the interests of the Company. Raney began to repay Elmore with a $5,000 payment on March 14, 1978. After that, Raney would periodically call Elmore to arrange a meeting at a shopping center, where Raney would deliver cash payments in amounts ranging from $2,000 to $5,000. Raney repaid a total of $42,000. In 1979 Raney stopped calling. When Elmore investigated on September 10, 1979, he learned *75 Raney was in the hospital with terminal leukemia. No more payments were made. Raney died in January 1980. About the time of Raney's first repayment the Company auditors discovered the Ila Long account. William H. ("Buddy") Sutton, the Company's lawyer, wrote Bob Raney on March 14, 1978, as follows: Re: T. J. Raney & Sons vs. St. Paul
Dear Bob: I would suggest that Bob Elmore be requested to sign a statement similar to the following: "I recognize and understand that certain irregularities appear in accounts which were under my responsibility when I was employed by T.J. Raney & Sons, Inc. In the event that the audit which is being done of the books and accounts at this time shows a shortage of assets on behalf of T.J. Raney & Sons, Inc., I hereby agree to reimburse T. J. Raney & Sons to the extent of the shortage and to indemnify T. J. Raney & Sons for all losses incident to such irregularities, discrepancies or shortages in any accounts under my responsibility. BOB ELMORE" Also, we need to be mindful of the time which is rapidly passing and the effect that time might have on filing for a bond loss if the need arises. I would appreciate your advising me where you *76 are with regard to the audit and how much more time you think it will take to determine the dollar amount of your loss. Yours truly, [s] Buddy William H. Sutton By handwritten note to Sutton, Raney responded by suggesting the proposed statement be softened to include, after "shortage," the words, "that I can't find or explain." Raney called Elmore to warn him about the new developments, asked him to meet with Sutton, and reassured him he would repay any of Elmore's losses. Elmore saw Sutton April 7, 1978. Elmore revised the Raney version of the proposed letter slightly. He added the word "alleged" before "irregularities" and the words "not previously reimbursed." Elmore then retyped and signed the statement, reproduced below: April 7, 1978 T.J. Raney & Sons, Inc., 200 Louisiana, Little Rock, Arkansas
Gentlemen: I recognize and understand that certain alleged irregularities appear in accounts of T.J. Raney & Sons, Inc. which were under my responsibility. In the event that the audit presently being done of the books and accounts shows a shortage which I cannot find or explain, I will reimburse T.J. Raney & Sons, Inc. to the extent of such shortage and expenses, *77 not previously reimbursed, in connection with the audit of accounts under my responsibility. [s] R. A. Elmore R. A. ELMORE Elmore signed the letter on Raney's assurance that Elmore would not lose anything. Throughout the investigation, as with the April interview, this pattern evolved: Raney would forewarn Elmore that Sutton was going to call him. He would tell Elmore what Sutton would say and what Elmore should reply. However, Sutton, who was unaware of the Raney-Elmore collusion, did not always follow the script. When that happened, Elmore did not know what to say. After a few such instances, at Raney's suggestion Elmore refused to talk with Sutton and instead insisted on negotiating through letters. Each letter from Elmore was preceded by a call or letter from Raney, who reviewed Elmore's letters to Sutton before he mailed them. Thus began nearly a year of Sutton's pressing Elmore to return the Ila Long bonds and Elmore's stalling until Raney could produce the bonds. In February 1979 [7] Raney again called. He instructed Elmore to write Sutton that he (Elmore) now had a job which would enable him to get the bonds. Elmore wrote the letter and, after Raney reviewed *78 it, mailed it to Sutton. The letter, dated February 13, 1979, states in part: You will recall that I have several times reiterated my willingness, subject to ability, to fulfill your clients' demands as to settlement of our differences. Well, it gives me great pleasure to state that, with the completion of a few details with which I solicit your assistance, that ability is now within my grasp. To wit, I have at last obtained an arrangement to get the unmatured bonds on our July 18 list, plus enough additional to make a total of $300,000 par value. This arrangement includes employment at a subsistence level, above the sums designated to repay the debt created by the abovementioned [sic] purchase. * * * Elmore did not in fact have a job and did not obtain any employment until 1983 when he took a part-time job at minimum wage. On February 23, 1979, Raney signed a release agreement, contingent on Sutton's receipt of the bonds by March 8, 1979 and his signed acknowledgment. Sutton sent the signed agreement (without his signature) to Elmore, saying Sutton would arrange to receive *79 the bonds at 10 a.m. on March 8th. Raney then called Elmore to come get the bonds. At their usual meeting place, the shopping center, Raney gave Elmore a sealed brown envelope on March 7, 1979. Without looking into it, Elmore immediately delivered it to the First National Bank where Sutton had his office. Sutton had Company employees count the $300,000 in bonds. He then signed a delivery receipt. The SEC closed its investigation upon Elmore's agreement that he would no longer be a member of the National Association of Securities Dealers (NASD) or be employed by a member of NASD. Elmore was never criminally prosecuted. [8]
During the years 1972 through 1978 petitioners reported income as follows: Self-Employment
Year
Wages
Income
Dividends
Interest
1972
$18,130.00
$404.00
$4,798.22
1973
16,527.00
406.20
5,715.24
1974
17,150.41
499.14
7,892.28
1975
17,392.64
562.95
11,005.28
1976
18,077.59
689.84
14,978.60
1977
19,320.00
764.30
18,351.57
1978
865.92
14,189.81
1979
$2,593.84
936.35
19,118.98
*80 In 1972, 1975, 1976, 1977, and 1978 all of the wages reported above represented Robert Elmore's salary from the Raney company or its predecessors, as reflected on W-2 forms. The wages for 1973 and 1974 include Mrs. Elmore's wages of $402 and $350.41. She also had self-employment income in 1979 of $2,593.84. During each of the years in issue, petitioners had various interest-bearing accounts and certificates of deposit. Principal (including the Raney account), increases from prior years, interest, and additions other than interest are shown below: [9]
Total
Increase From
Interest
Other
Year
Principal
Prior Year
Reported
Additions
1975
$170,254.34
(Unknown)
$11,005.28
(Unknown)
1976
190,101.41
$19,847.07
14,978.60
$4,868.47
1977
206,206.17
22,842.90
18,351.57
4,491.33
*81 Elmore produced checks showing $5,000 was deposited to an account in 1976, and another $5,000 in 1977, which explain the non-interest component of the increases in those years. The checks were drawn on petitioners' joint checking account. Elmore testified that the 1976 check represented savings accumulated in the checking account since March 1975, and that the 1977 check represented proceeds from redemption of an industrial revenue bond ($5,000) less purchase of "E" bonds ($3,750) plus savings since November 1976. Petitioners' practice was to deposit Elmore's paychecks in their joint checking account. They would accumulate unspent funds there until they could purchase CD's, bonds, or make significant contributions to their bank savings accounts. The checking account and Raney account were joint; all others were in Mrs. Elmore's name. Mrs. Elmore deposited the savings and purchased CD's and bonds. She monitored interest rates and moved funds around when it was advantageous. Since she did not work outside the home, both petitioners felt it was more convenient to have the accounts in her name. Besides, much of petitioners' principal came from Mrs. Elmore's inheritances. Her *82 farther, grandfather, and aunt had all left her money, which totaled around $19,000. She received at least $10,000 from her grandfather and father in the 1930's at age 18. She spent part of it on her education, invested in a rice farm, and put part in savings bonds. In 1944 the rice farm was sold and the proceeds were distributed annually to Mrs. Elmore and the other investors in her family. She believed she received as her share at least $25,000 over a period of time. She put the proceeds in bank accounts, bonds, and spent some on an education.These funds were in her name alone at the time she married Elmore in 1946. In 1975 Mrs. Elmore inherited about $9,000 from an aunt, which was also invested in an interest-bearing account. Petitioners continued to add to these accounts from time to time and to make additional investments. Petitioners have been married 40 years. They share the same financial philosophy, which is to avoid debt at all costs. They live very frugally. For years they have saved everything they could to pay cash for a future house of their own design that has never materialized. [10] Mr. Elmore called installment plans "the never never," because "You never, *83 never get it paid. The only never, never we were on, if you didn't get the money together, you never bought it." Mrs. Elmore testified "Not in all my life have I ever borrowed any money to purchase anything." In October 1955, petitioners paid $12,000 cash for a small house. The house has four rooms: a very small bedroom and a larger bedroom, a kitchen and a living room. The tax assessment at time of trial was around $35,000. Mr. Elmore drove a 1963 Oldsmobile until 1976 when he acquired a new Cadillac for cash. At time of trial, ten years later, he was still driving the Cadillac and had no other car. With no mortgage or car payments, the Elmores have had very low monthly expenses. When she was employed, Mrs. Elmore worked for a company that furnished all the dairy products they could use, including ice cream, eggs, and butter. She was earning $500 to $600 a month, most of which went into savings. Her aunt has a large rice farm and gives them free vegetables and fruits which they freeze. Mrs. *84 Elmore makes her own jellies. One brother has a farm with a garden. He was a lieutenant commander in the Navy, and would pick up meat from the commissary at low prices for the Elmores.After Mrs. Elmore stopped working in 1962 to care for her mother, her mother, brother, and sister contributed to the mother's support. Mrs. Elmore's mother lived with petitioners from 1962 to at least 1977. Petitioners did very little traveling. Vacation time, if any, was usually spent working on the house. Mrs. Elmore has no furs and very little jewelry. Elmore wears his suits 25 years. Petitioners are still using the very first sofa they bought when they married in 1947. They still use the stove they purchased in 1955 when they moved into the house. They still use the carpet (only the living room is carpeted) installed in 1960. They do not eat out, other than an occasional hamburger. ULTIMATE FINDINGS OF FACT Petitioner Robert G. Elmore did not receive embezzlement income during the years in issue. OPINION Respondent contends that petitioner acted alone, secreted cash and the bonds from the Ila Long account, was discovered by Mr. Chitwood, the Company controller, and fired. Respondent *85 points to petitioner's replacement of the bonds and his surrender of his $49,000 company account as indicative of guilt. Respondent also contends that Mr. Elmore's salary was not sufficient to have accumulated the savings in petitioners' various bank accounts. Respondent views with suspicion the cash purchase of petitioners' 1976 Cadillac and the fact that the car and most of the savings accounts are in Mrs. Elmore's sole name. We have adopted petitioners' version of the facts. In the main, petitioners' story is consistent with and, in fact, supported by the testimony of respondent's witnesses and the record as a whole. Elmore insists he left the company because of illness, not because he was fired. Respondent's investigating agent testified Elmore said he left the Company because accounts were being computerized and the Company had hired an outside service to deliver bonds. However, the agent's report shows that Elmore described his illness in detail, describing his loss of sight, the brain tumor, cobalt treatments, limited use of his left arm, and nerve damage. The report states: He also advised that he has problems which causes his legs to collapse under him. He said *86 he generally warns people about this because when he drops suddenly many people think he is having a heart attack. We do not think Elmore intended to mislead the agent. The agent should have inferred, if Elmore did not say so directly, that he could not have continued to perform his duties in the face of such difficulties. We observed Elmore on the stand. At age 65 he is frail, bent, walks slowly and as if in pain, and has a noticeable tremor. Although the trial occurred several years after the period in issue, we have no trouble in believing that Elmore's health precipitated his resignation. Nowhere in the record is Elmore reported as having admitted that he benefitted personally from the misdirection of company funds. He did assume responsibility for repaying the missing amounts. His explanation is that he assumed this responsibility out of loyalty to his boss and friend, Bob Raney, who assured Elmore he would be protected. After Raney's death Elmore no longer felt compelled to remain silent. Since Raney was the only other person who knew of the arrangement Elmore's story cannot be directly verified. The Raney-Elmore axis was hidden from respondent's witnesses, Sutton *87 (the company lawyer) and Chitwood (the controller). Their assumption of Elmore's guilt is therefore consistent with his story. Indeed, some aspects of their testimony support him. Sutton testified, and his time sheets show, that he usually spoke with Bob Raney before contacting Elmore. He also testified that after a few face-to-face meetings, Elmore refused to negotiate in person and began to negotiate only by mail. Sutton's file [11] reveals that only two days after Elmore wrote a letter in which he continued to deny he owed the amount Sutton was seeking, i.e., $300,000, he suddenly and without further correspondence from Sutton wrote that he had a job, and could now produce the bonds. This is consistent with Elmore's explanation that Raney had finally come up with the bonds and had given Elmore the "job" cover story to explain the delay. *88 We also note that Elmore was never threatened with criminal prosecution. We believe Raney was protecting him. Even when Sutton was exerting all the pressure he could to make Elmore pay up, his strongest threat was that he would go to the bonding company or to the insurance company.This was in fact, probably much more terrifying to Raney than to Elmore, since it could trigger a more detailed investigation, bring in the SEC, and even lead to the company's collapse. Evidence that Raney was protecting Elmore can also be inferred from Chitwood's testimony. The Company controller testified that when he complained to Bob Raney that Elmore was not cooperating with Chitwood's suggestion to close some of the bank accounts, Raney did not back Chitwood. The accounts were never closed. Raney told Chitwood he was "reluctant to believe that Mr. Elmore was creating any problems." Late in 1976 or early 1977 Chitwood discovered misdirected funds. When he showed some specific examples to Raney, Raney did not act on the information. Instead, he asked Chitwood to come back with a much larger analysis. When Chitwood reported the problem to the board of directors, "the report was not necessarily *89 eagerly received." Although Chitwood brought this information to Bob Raney's attention in late 1976 or early 1977, Raney apparently did not notify the Company lawyer until March 14, 1978, as shown by a document entitled "New Case Report" in Mr. Sutton's file. Chitwood, who has only a high school education and is not a CPA, prepared an analysis which purported to show Elmore made payments from his personal account to buy bonds for the Ila Long account. However, under questioning Chitwood backed down: THE COURT: Well I want to know how you identified this withdrawal of $14,000 from Mr. Elmore's account? How do you know that that money was used to buy Ila Long bonds? THE WITNESS: I was not intending to say that. All I had intended to say is that I had made an analysis that revealed this source that existed at that time. THE COURT: Oh. That that is a possible source? THE WITNESS: They took -- yes ma'am. [Emphasis added.] In other words, Chitwood was simply identifying all possible sources from which the funds to purchase bonds for the Ila Long account could have come. Elmore's personal account was one possible source. In another portion of his analysis, Chitwood *90 posited some $33,000 of withdrawals from Elmore's account, but never satisfactorily explained his calculations. The Company's own records, however, show withdrawals in 1975 totaling only $2,824.16 and no withdrawals in 1976 or 1977. We thus give little credence to Chitwood's opinion that Elmore used his own money to purchase Ila Long bonds. The balance of Chitwood's testimony simply confirms what Elmore admits, i.e., that the altered books were under Elmore's control. Chitwood acknowledged he would have no way of knowing whether Elmore acted under orders from someone else, or whether someone else spent the money that was misappropriated. Chitwood's testimony supports Elmore's theory in two of other respects. First, he said Elmore lacked authority to sign checks, but Bob Raney did have such authority.Chitwood acknowledged that Raney's signature, apparently genuine, appeared on all the doctored checks, although it was Chitwood's surmise that the signature must have been traced or forged. There is no evidence in the record for such a "forgery" theory. In fact, when Chitwood mentioned the possibility to Bob Raney, Raney identified his signature and took no further action. *91 Second, Chitwood acknowledged that Elmore could not have made trades for customer accounts since he was not a registered representative. Bob Raney, however, was a registered representative. Thus it appears clear from Chitwood's testimony that Elmore could not have acted alone in generating cash or credit for the corporation by writing false checks nor in purchasing the bonds for the false account. He could, however, have acted in concert with Bob Raney. Respondent alleges Elmore made inconsistent statements to the investigating agents. Elmore told the agents that up until 1972 he kept $40,000 to $50,000 cash in the house, which he was saving to build his planned residence. This was before the years in issue. We assume some of the cash was used to buy the Cadillac in 1976 and the rest was ultimately deposited in the accounts shown. Whether the "dream house" fund originally accumulated in the house or in the bank is not material. When the agents asked about Elmore's part in the so-called embezzlement, he told exactly the same story he has told in this Court. The agents testified the Elmore home was modest and that they had no reason to believe Mrs. Elmore was involved in *92 the embezzlement. Finally, respondent simply assumed that petitioners could not have acquired sufficient capital through their normal sources of income to have generated the amounts of interest reported on their returns. Respondent had access to the actual account numbers and rates of interest paid by the banks, but did not investigate. Instead, respondent relied on Chitwood's analysis and made no independent analysis of his own. We believe petitioners have amply demonstrated that the increases in bank accounts during the years in issue came from accrued interest plus yearly deposits of about $5,000, clearly possible from Elmore's wages in light of petitioners' frugal lifestyle. Their explanation of the origins of their savings is likewise credible. Since we have found that petitioners received no unreported embezzlement income during the years in issue, there is no underpayment of tax. Therefore, the issues regarding the fraud addition and whether Mrs. Elmore is an innocent spouse are moot. Decisions will be entered for petitioners.
Footnotes
1. Each petitioner filed a separate petition contesting the same notice of deficiency. These cases involve the joint liability of a husband and wife for joint returns filed for the same years, and have therefore been consolidated for trial, briefing, and opinion.↩
2. All section references are to the Internal Revenue Code in effect during the taxable years at issue.↩
3. We do not have sufficient evidence to find that these payments were illegal. Petitioner, however, believed them to be so.↩
4. Elmore did not keep records of the amounts procured, fearing he would be fired if he did.↩
5. Employees were permitted to put personal funds into a savings account, on which the company paid interest at the prime rate. This was a much higher return than Elmore could obtain elsewhere. Elmore started the account with $5,000 from his own funds. ↩
6. The statement signed by Elmore says "approximately $48,000," but the actual amount, with accrued interest, was $49,293.99.↩
7. This apparently occurred February 12th or 13th, judging from correspondence in evidence.↩
8. Elmore credited Bob Raney for arranging such a minor sanction. He testified, "Even on his death bed, why, Bob was looking out for me."↩
9. The most natural inference from Elmore's testimony would be that the amounts shown on petitioners' schedule of bank accounts reflect end of year balances. However, the amounts shown by petitioners as the "Raney account," represent balances at the beginning↩ of each year. For instance, the "Raney account" amounts shown by petitioners are $37,215.89, $37,739.97, and $42,555.85 for 1975, 1976, and 1977. However, Company records show balances of $37,739.97 on December 31, 1975, $42.555.85 on December 31, 1976, and $49,293.99 on December 31, 1977, when Elmore waived his rights to the account. The above totals reflect the amounts shown on petitioners' chart, except that higher Raney balances are substituted. For this reason the "increases" and "other additions" above may not be exact.
10. Both petitioners are in poor health, and Mrs. Elmore's mother has Altzheimer's disease. As taxes and housing costs rose and their health declined, petitioners' dream faded.↩
11. Most of the material in Sutton's file was received at trial without objection. We reserved ruling on the unagreed documents. After considering the parties' arguments and examining the remaining documents, we now hold they are admissible under Fed. R. Evid. 803(6) and 803(3)↩.