SHIRLEY J. DAVIS, f.k.a. SHIRLEY J. LINDSEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Davis v. Commissioner
Docket No. 16627-88
United States Tax Court
T.C. Memo 1991-333; 1991 Tax Ct. Memo LEXIS 384; 62 T.C.M. (CCH) 194; T.C.M. (RIA) 91333; July 22, 1991, Filed *384 Decision will be entered for the respondent. William A. Dougherty, for the petitioner. Terri A. Merriam and Milton B. Blouke, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in, and additions to, petitioner's individual Federal income tax as follows: Tax Year
Additions to Tax
Ended
Deficiency
Sec.
Sec.
Sec.
Sec.
[1] 6661 6653(b)
6653(b)(1)
6653(b)(2)
December 31, 1980
$ 27,388   N/A  $ 13,694
N/A
N/A
December 31, 1981
151,059
N/A  75,530
N/A
N/A
December 31, 1982
862,525
$ 215,631
N/A
$ 431,263
*
December 31, 1983
1,386,598
346,650
N/A
693,299
*
The issues for decision are (1) whether *385 petitioner had unreported income from funds embezzled from Hughes Aircraft Company (Hughes) in tax years 1980, 1981, 1982, and 1983, and, if so, in what amounts; (2) whether petitioner is liable for the additions to tax for fraud, per section 6653(b); (3) whether petitioner is liable for additions to tax pursuant to section 6661, due to a substantial understatement of income tax liability, for tax years 1982 and 1983; and (4) whether petitioner is liable for additions to tax pursuant to section 6653(a), for negligence or intentional disregard of rules and regulations with respect to income taxes, in lieu of the fraud additions under section 6653(b). The statutory notice of deficiency that was sent to petitioner on or about April 15, 1988, reflected a deficiency for the tax year ended December 31, 1983, of $ 692,495. This deficiency was increased by respondent in his amendment to answer, filed on January 2, 1990, to $ 1,386,598, to correct a computational error. The additions to tax for the year ended December 31, 1983, were increased due to the correction of this computational error. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations *386 of facts, together with the attached exhibits, are incorporated herein. Petitioner resided in the Federal Correctional Institution at Fort Worth, Texas, when she filed her petition in this case. A. Background
Petitioner filed Federal income tax returns for all years in issue. She reported adjusted gross income for those years of $ 18,136, $ 21,019, $ 24,144 and $ 25,433, respectively, which consisted entirely of amounts paid to her by her employer, Hughes, as compensation for services. Petitioner married Clyde L. Davis on April 16, 1983; she elected the filing status of "Married, Filing Separate Return" for the tax year 1983. Petitioner's filing status for tax years 1980 through 1982, inclusive, is not known. B. Responsibilities at Hughes
Petitioner was employed by Hughes as a Group Insurance Analyst. In furtherance of her responsibility of processing medical claims made by Hughes' employees and their dependents, petitioner had authority to issue checks from the Hughes Comprehensive Medical Plan for up to $ 10,000. Each of the checks that petitioner issued included a statement on its face to the effect that it was not good for more than $ 10,000; the computer system *387 was programmed not to issue checks for more than $ 10,000. No internal controls existed in the computer system to preclude petitioner from issuing checks in an amount less than $ 10,000. The checks were payable to the providers of medical services to whom the Hughes employees had assigned the benefits, or directly to the employees if the benefits were not assigned. In the case of a deceased employee, if the benefits were not assigned to a provider of medical services, the computer system prepared the check for the proper amount, but the payee was not noted. Instead, the payee's name was manually typed onto the check, and forwarded to him or her. C. Responsibilities at Rocshire, Inc. In addition to her position with Hughes, petitioner was a shareholder in Rocshire, Inc. (the corporation or Rocshire). The corporation was engaged in different aspects of the recording industry through its various divisions or branches, Rocshire Records, Rocshire Publishing, Rocshire Production, and Rocshire Studios. Petitioner was the sole shareholder of Rocshire, Inc., during the periods at issue. Sometime in 1982, 1983, or 1984, she transferred 51 percent of her ownership in the corporation *388 to Clyde L. Davis (Mr. Davis). Ownership of the corporation's stock notwithstanding, petitioner's responsibilities at the corporation did not change after the shares were transferred. Petitioner was primarily responsible for management of the corporation's finances. The corporation maintained at least three checking accounts at Bank of America, either in its corporate name or in the name of one of its branches. [2] Petitioner was a signatory to each of the accounts. Each account required only one signature on a check to draw from the account. The other signatories were as follows: Rocshire, Inc.: Mr. Davis and Daryl Thompson; Rocshire Productions: Mr. Davis; and Rocshire Records: Mr. Davis, Daryl Thompson, and Gary Davis. Although the corporation's bylaws were not entered on the record, the signature cards for the Rocshire, Inc., *389 and Rocshire Records checking accounts listed petitioner as "Secretary/CFO." "CFO" is a commonly understood abbreviation for "chief financial officer," the officer in a corporation primarily responsible for administration of the organization's finances. The signature card for the Rocshire Productions account did not list the corporate officers. The other officers noted on the signature cards were as follows: Mr. Davis -- president/chairman; Gary R. Davis-president; and Daryl Thompson -- vice-president. Although petitioner did not come into the corporation's office until midafternoon, after she had completed her workday at Hughes, her responsibilities included supervision of the bookkeeping staff, coordination with the corporation's certified public accountant, making travel advances to employees, and accounting for any excess or shortfall in the advances. Although Mr. Davis also made some travel advances to employees on behalf of the corporation, that role was primarily performed by petitioner. D. Embezzlement
Through her position of trust at Hughes, petitioner devised a scheme to embezzle funds from the Hughes Medical Plan. Petitioner's scheme was bifurcated between fraudulent *390 claims which she made in the name of Mr. Davis (she fraudulently listed Mr. Davis on the Hughes employee rolls so the system would enable petitioner to issue checks to him), and later, a more daring approach, fraudulent claims made by petitioner in the names of deceased employees. In total, more than 1,600 checks were embezzled during the period August 11, 1980, to July 19, 1984, which totalled approximately $ 12 million, in the following increments: 1980 - $ 58,522.15; 1981 - $ 241,686.79; 1982 - $ 1,742,585.37; 1983 - $ 5,556,066.82; and 1984 - $ 4,386,952.18. The funds were deposited into various accounts to which petitioner was a signatory. Most of the checks written during the period August 11, 1980, to December 31, 1981, were deposited into Bank of America account no. 1165-01354. This account was in the name of petitioner and Mr. Davis, both of whom had signatory authority over the account. Most of the checks written during the period January 1, 1982, through July 19, 1984, were deposited into the corporation's checking account at Bank of America, or one of two accounts maintained by one of the corporation's branches, also at Bank of America. Petitioner had signature authority *391 over each of these corporate or branch accounts, as discussed above. Petitioner used several pretenses to cover up the embezzlement scheme. She told the corporation's certified public accountant that the large, unexplained deposits made into the corporation's bank accounts were loans from its shareholders. She variously said that the money was received from Mr. Davis' father, from royalties received by Mr. Davis by virtue of an invention he sold, and from an insurance settlement for an accident in which Mr. Davis was supposedly involved. 1. 1980-1981
All of the checks that petitioner embezzled in 1980, and most of the checks that she embezzled in 1981, were on account of the putative claimant "C. L. Davis," i.e., her boyfriend at the time. The remainder of the checks embezzled in 1981 were on behalf of the following putative claimants: "Alice C. Davis" - two checks, "Shirley J. W. Davis" - one check, "P. Lok Lindblad" - three checks, and "Armandina P. Vallejo" - two checks. No evidence was placed on the record as to whether these claimants were deceased employees, or simply new "employees" that petitioner fraudulently placed on the Hughes employee rolls. Checks during *392 this period were payable either to Mr. Davis himself, ostensibly as benefits which he as the employee did not assign to a provider of medical services, or to "Clyde L. Davis, M.D.," by virtue of a supposed assignment of benefits. Petitioner was concerned about issuing checks to "Dr. Davis," as she feared that the real Dr. Clyde Davis would be issued a Form 1099 by Hughes; this would have created tax problems for him, which might ultimately have brought the trail to her. In spite of this fear, she continued her enterprise in the same manner. 2. 1982-1984
During the period 1982 through 1984 petitioner became more daring in her methods of appropriating funds from the Hughes Medical Plan. She issued only 12 checks on behalf of a claimant with the name "Davis": 5 checks to "C. I. Davis" and 7 checks to "G. L. Davis." The last was issued April 1, 1982. Most of the remaining 1,500 checks she embezzled during this period were on behalf of deceased employees. Additionally, petitioner began to issue two checks on the same date for slightly different amounts. Supposedly, the first check was to be voided due to an error in the amount, and a second check was then issued. Petitioner *393 noted in Hughes' records that the check was voided, but instead of placing the first check with other voided checks in the office files, petitioner took both checks. The checks were made payable to "Clyde L. Davis, M.D.," or "Clyde L. Davis." Petitioner continued to fear that a Form 1099 would be issued to the real Dr. Davis during this period. E. Discovery of the Scheme
Hughes hired Pacific Mutual to provide expert advice on medical claims made by Hughes employees. As part of this review, on July 24, 1984, representatives of Pacific Mutual asked to see several claims that were later determined to be fraudulently made by petitioner in the manner described above. After being confronted with the proof, petitioner admitted to embezzling $ 60,000 as part of an alleged scheme to launder money and coverup her husband's supposed gambling activities. She later admitted to embezzling $ 100,000, and stated that she had repaid all but $ 60,000. Petitioner at one point during the investigation stated that she maintained records of the amount. During the course of an investigation by the Federal Bureau of Investigation, petitioner made several other false statements, including an *394 attempt to exonerate Mr. Davis by stating that he had no knowledge of the scheme until she was confronted by Hughes. Hughes' internal auditors determined the amount embezzled to be approximately $ 12 million. Petitioner admitted to this amount as part of her plea agreement, in which she pleaded guilty to 10 counts of embezzlement from an Employee Benefit Plan [3] and one count of conspiracy. [4] The 10 counts of embezzlement to which she pleaded guilty represented more than $ 80,000. F. Use of the Embezzled Funds
After the checks were prepared by petitioner, they were deposited into one of the various checking accounts to which she was a signatory at Bank of America, as discussed above. Petitioner or Mr. Davis endorsed the checks before they were deposited. Approximately $ 750,000 of the embezzled funds was used to pay petitioner's personal expenses. The balance of the funds was used by Rocshire, Inc., to pay its operating expenses and to buy its fixed assets. *395 Included in the corporation's operating expenses were amounts referred to as "payola." These payments represent fees paid by some members of the entertainment industry to other individuals to promote records or films. Petitioner was aware that such payments were illegal, and intended to record them as "promotional fees." The corporation has no other significant source of financing. Mr. Davis paid no more than $ 200,000 to the corporation. Aside from $ 25,000 recorded as "common stock," the balance of the funds paid to the corporation by its shareholders as of December 31, 1983, was recorded as loans from the shareholders. The corporation's balance sheet as of December 31, 1983, included with its Federal income tax return for the year then ended, reflected other debt of $ 276,778. [5] The total of these two items represents only 7.5 percent of the amount that the corporation required as of December 31, 1983. [6]
*396 OPINION A. Burden of Proof
In general, the burden is on the taxpayer to prove that respondent's notice of deficiency is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); United States v. Stonehill, 702 F.2d 1288, 1293 (9th Cir. 1983). However, courts have recognized an exception to this general rule when respondent alleges that petitioner has unreported illegal income, as in this case. Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979); Petzoldt v. Commissioner, 92 T.C. 661, 688 (1989). In Weimerskirch, the Ninth Circuit Court of Appeals, to which an appeal in the instant case will lie, said: "There must be some evidentiary foundation linking the taxpayer to the alleged income-producing activity * * * where * * * the government asserts that the taxpayer was engaged in an activity which is otherwise illegal." Weimerskirch v. Commissioner, 596 F.2d at 362. In marked contrast to the instant case, the Commissioner in Weimerskirch called no witnesses and presented no evidence to support his determination, whereas the taxpayer called four witnesses *397 and introduced his tax return as evidence. Weimerskirch v. Commissioner, 596 F.2d at 359. The Court found that the Commissioner had not met his obligation of providing a foundation for his assessment. Weimerskirch v. Commissioner, 596 F.2d at 362. Here, respondent presented evidence, through testimony of five witnesses, 27 joint exhibits and 3 other exhibits, of petitioner's responsibilities at Hughes, the manner in which she embezzled the funds, her use of the embezzled funds, and the fact that the funds were not reported on petitioner's tax returns as filed. This evidence amply satisfies the "some evidentiary foundation" standard, as announced in Weimerskirch v. Commissioner, 596 F.2d at 362. Therefore, the burden of going forward as well as the burden of proof remains on petitioner to disprove respondent's determinations in his notice of deficiency. Respondent bears the burden of proof as to increases in the deficiency pleaded in his answer. Rule 142(a). We find that respondent has met his burden of proof. B. Embezzled Funds Constitute Income to Petitioner. Embezzlement income constitutes gross income under *398 section 61(a). [7]James v. United States, 366 U.S. 213, 6 L. Ed. 2d 246, 81 S. Ct. 1052 (1961). See also Hadden v. Commissioner, T.C. Memo 1990-578; Hoffman v. Commissioner, T.C. Memo 1989-398; sec. 1.61-14(a), Income Tax Regs.
In the instant case, petitioner pleaded guilty to 10 counts of embezzlement. Further, as part of her plea agreement, she admitted to embezzling approximately $ 12 million from Hughes during the period August 11, 1980, to July 19, 1984. At no time during this proceeding did petitioner contest the amount of money which she embezzled, as asserted by respondent, in the following amounts: 1980
$ 58,522   1981
241,687
1982
1,742,585
1983
5,556,067
1984
4,386,952
1. Petitioner had dominion and control over the embezzled funds. Petitioner argues that the embezzled funds should not be income to her, because she had no dominion or control over them *399 after she caused Hughes' system to write the checks. Petitioner makes much of the facts that the embezzled checks were payable to Mr. Davis, and that at least some of them were endorsed by him and deposited into the account of Rocshire, Inc., or one of its branches. We do not agree. Most of the checks written during the period August 11, 1980, to December 31, 1981, were deposited into a bank account petitioner maintained in her and Mr. Davis' names. No credible argument could be made to assert that petitioner did not have control over these funds, especially in light of the testimony of the FBI agent who investigated the scheme: Q Mr. Orswell, did Shirley Davis indicate that she had signed or at least marked "For Deposit Only" on all of these checks? A Yes, she did.
In Estate of Geiger v. Commissioner, 352 F.2d 221 (8th Cir. 1965), affg. a Memorandum Opinion of this Court, the court held that the funds the taxpayer embezzled constituted income to her in accordance with James v. United States, supra, in spite of the fact that "other persons were the recipients of the 'loans and gifts' * * *. These beneficiaries were the objects *400 * * * of [Mrs. Geiger's] bounty, not the bank's [from which she embezzled the funds]. She was the force and fulcrum which made those benefits possible. She assured unto herself actual command over the funds." Estate of Geiger v. Commissioner, 352 F.2d at 231 (emphasis added). The Fifth Circuit adopted the same position in Bailey v. Commissioner, 420 F.2d 777 (5th Cir. 1969), when it affirmed a Tax Court opinion that said, "[petitioner's] exercise of control over these funds is sufficient for them to constitute income to her." Bailey v. Commissioner, 52 T.C. 115, 119 (1969) (citations omitted). Bailey involved a taxpayer who was employed by a bank in a capacity through which she had access to bank records. She had the embezzled funds deposited into an account maintained by her brother at the bank. In spite of the fact that the money was used to satisfy obligations of her brother, the Court ruled that "in all the transactions, * * * [taxpayer] exercised complete dominion and control over the embezzled funds. She beneficially enjoyed this income and, in effect, treated it as her own when she chose to place it *401 at her brother's disposal." Bailey v. Commissioner, 52 T.C. at 119. See also Cruea v. Commissioner, T.C. Memo 1985-553; Lota v. Commissioner, T.C. Memo 1985-270; United States v. Lippincott, 579 F.2d 551 (10th Cir. 1978). Petitioner embezzled the funds, not Mr. Davis. Without her efforts, neither Rocshire, Inc., nor Mr. Davis would have had use of the money. Whether or not the checks were payable to Mr. Davis, petitioner controlled the spigot from which the checks flowed. Even assuming, arguendo, that Mr. Davis endorsed each of the checks himself, the fact that petitioner marked "For Deposit Only" on each check demonstrates that she controlled their disposition. 2. Petitioner derived economic benefits from use of the embezzled funds. There is also no question that petitioner used the embezzled funds to acquire personal benefits. Approximately $ 750,000 of the embezzled funds was used by petitioner for personal purposes, including a horse for her daughter, groceries, and cars for herself and her family. The balance of the embezzled funds was used by Rocshire, Inc., or one of the corporation's *402 branches. Although no absolute evidence was presented as to when petitioner transferred a controlling interest in the corporation to Mr. Davis, the corporation's attorney testified that the transfer was made sometime after the two were married on April 16, 1983. Further, the corporation's 1983 Federal income tax return reflects that petitioner owned 100 percent of the corporation's common stock as of December 31, 1983. This information was told by petitioner to the corporation's certified public accountant who prepared the tax return. Based upon the evidence, we find that petitioner owned 100 percent of the corporation's common stock during all periods relevant to this proceeding. Therefore, petitioner clearly derived economic benefits from the portion of the embezzled funds used by Rocshire, Inc., or one or more of its branches. As sole shareholder of the corporation, petitioner alone benefitted from the corporation's existence, and alone stood to benefit from any increase in the corporation's value. Moreover, as petitioner had signature authority over each of the corporation's checking accounts, which she could have exercised alone, there is no doubt that she exercised dominion *403 and control over the funds she embezzled and which she caused to be deposited into accounts of Rocshire, Inc. 3. Petitioner was not a "conduit" for the embezzled funds. We find that petitioner was far more than a mere conduit for the embezzled funds. She controlled the account to which the money was deposited, and in her capacity as the corporation's chief financial officer, she controlled the ultimate disposition of the funds. Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir.1974) ("We accept as sound law the rule that a taxpayer need not treat as income moneys [sic] which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit."); compare Beasley v. Commissioner, T.C. Memo 1989-173 (the portion of funds embezzled by taxpayer, as part of employer's plan to make illegal political contributions, that were in fact paid out as such, were not embezzlement income to taxpayer; the balance of the funds not so paid was income to taxpayer); Elmore v. Commissioner, T.C. Memo 1987-72 (funds *404 embezzled at the behest of taxpayer's employer, and passed on to him, did not constitute embezzled income to taxpayer). Since petitioner did not repay any of the embezzled funds during the years at issue, she is not entitled to a deduction. See James v. United States, 366 U.S. at 219-220. The amount repaid is deductible only in the year of repayment, and only to the extent actually repaid. Hauser v. Commissioner, T.C. Memo 1970-207; Rappaport v. Commissioner, 583 F.2d 298 (7th Cir. 1978). Therefore, based on the foregoing, we find that petitioner has unreported income from embezzlement in the following amounts: 1980
$ 58,522   1981
241,687
1982
1,742,585
1983
5,556,667
C. Fraud
Respondent determined petitioner is liable for additions to tax for fraud under section 6653(b) for tax years 1980 and 1981, and under section 6653(b)(1) and (2) for tax years 1982 and 1983. Section 6653(b)(1) and section 6653(b) provide that if any part of the deficiency is due to fraud, the addition to tax under this section shall be in an amount equal to 50 percent of the deficiency. Moreover, section 6653(b) (2) adds to the *405 tax an amount equal to 50 percent of the interest due on any part of the deficiency attributable to fraud. Fraud is defined as an "intentional wrongdoing on the part of the taxpayer with the specific intent to avoid a tax known to be owing." Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985) (citing Conforte v. Commissioner, 692 F.2d 587, 592 (9th Cir. 1982)). See Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958). Respondent bears the burden of proof as to additions to tax for fraud under section 6653(b). That burden is to be carried by clear and convincing evidence. Rule 142(b). Further, respondent cannot rely on petitioner's failure to prove error in respondent's determination to meet his burden of proving fraud. Sec. 7454(a); Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982); Otsuki v. Commissioner, 53 T.C. 96, 106 (1969); Rule 142(a). This burden must be met by clear and convincing evidence. Rule 142(b); Stone v. Commissioner, 56 T.C. 213, 220 (1971). To meet this burden, respondent must show that (1) there was an underpayment, and (2) *406 petitioner intended to evade taxes known to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Lord v. Commissioner, 525 F.2d 741, 746 (9th Cir. 1975); Stoltzfus v. Commissioner, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, 94 T.C. 654, 661 (1990). Respondent need not prove the precise amount of the underpayment resulting from fraud; so long as he shows that "any part of any underpayment * * * is due to fraud," the addition to tax will be upheld. Conforte v. Commissioner, 692 F.2d at 590. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1975), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be imputed or presumed, but rather must be established by some independent evidence of fraudulent intent. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, supra.However, fraud may be proven by circumstantial evidence and reasonable *407 inferences drawn from the facts because direct proof of petitioner's intent is rarely available. Spies v. United States, 317 U.S. 492, 87 L. Ed. 418, 63 S. Ct. 364 (1943); Powell v. Granquist, 252 F.2d at 61; Rowlee v. Commissioner, 80 T.C. 1111 (1983). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. at 223-224; Otsuki v. Commissioner, 53 T.C. at 105-106. The willingness to defraud another in a business transaction may point to a willingness to defraud the Government. Solomon v. Commissioner, 732 F.2d 1459, 1462 (6th Cir. 1984), affg. per curiam a Memorandum Opinion of this Court. A taxpayer's experience and knowledge, especially knowledge of the tax laws, is a further justification for the inference of fraud. Solomon v. Commissioner, 732 F.2d at 1461-1462; Tooke v. Commissioner, 595 F.2d 1229 (9th Cir. 1979), affg. a Memorandum Opinion of this Court. A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, *408 justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137, 99 L. Ed. 150, 75 S. Ct. 127 (1954); Brooks v. Commissioner, 82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985); Fry v. Commissioner, T.C. Memo 1991-51. Courts have relied on a number of indicia of fraud in deciding section 6653(b) cases. Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence of fraud. Solomon v. Commissioner, 732 F.2d at 1461; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Beaver v. Commissioner, 55 T.C. at 93. The Ninth Circuit Court of Appeals, in Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court, stated that the existence of the following facts, inter alia, supported a finding of fraudulent intent: (1) The taxpayer engaged in an illegal activity; (2) he failed to report substantial portions of his income, which he knew to be taxable; (3) he attempted to conceal his illegal *409 activities; and (4) he failed to maintain adequate records. For the reasons stated below, we find that petitioner fraudulently intended to evade the taxes which she knew to be owing on the funds she embezzled from Hughes, and that her actions were directed at concealing her tax liability. Petitioner's course of conduct was aimed at concealing the embezzlement scheme, not only from the Government, but also from almost everyone with whom she had contact. Petitioner took great pains to be sure the Hughes records appeared, at least on their face, to be in order. She only issued checks for less than $ 10,000, so as not to raise a question from one of her supervisors. She was careful to use mostly deceased employees as the putative claimants in her scheme, so as to avoid potential questions from the employees and to enable her to decide to whom the checks would be payable, as they would be prepared without the payee noted. She indicated in Hughes' files that the checks supposedly written in error were voided, when in truth she used the checks for her own purposes. The fact that petitioner was able to hide her enterprise from Hughes for almost 4 years attests to the lengths to which *410 she went to conceal her actions. Petitioner was fully aware of the tax consequences of her actions. She was concerned that a Form 1099 would be issued to the real Dr. Davis, which might have caused her house of cards to collapse. This fear indicates a knowledge of the reporting responsibilities imposed on Hughes by the Government, and the impact that the information so reported has on a taxpayer's tax return. She told Rocshire, Inc.'s certified public accountant that the money which she caused to be deposited into the corporation's accounts was a loan from the corporation's shareholders, and thereby avoided a corporate-level income tax on the embezzled funds. This knowledge points to sufficient understanding of the tax laws for her to be aware that the embezzled funds constituted income to her. Petitioner was aware that the "payola" payments which the corporation made were illegal, and intended to couch them on the corporation's tax return so as not to create suspicion for the corporation. This is further evidence of her pattern of concealment. When confronted by Hughes' representatives, petitioner continued in her efforts to conceal her scheme. She initially stated that *411 only $ 60,000 was outstanding. Later, she admitted to $ 100,000. It is not conceivable that she truly believed that she embezzled these amounts, especially when one considers that she actually took approximately $ 12 million, and when she is purported to have maintained records of the amount embezzled, even though these records were not presented at trial. Clearly, petitioner did more than merely understate her income on her tax returns. Her pattern of conduct points to an understanding of the tax laws, and a purposeful attempt to avoid taxation of the embezzled funds. Application of the Bradford "badges of fraud" to this case provides additional support for a determination that the taxpayer fraudulently failed to report the embezzled funds on her tax returns. Like the taxpayer in Bradford, petitioner engaged in illegal activities, failed to report substantial portions of her income, attempted to conceal her illegal activities, and failed to maintain adequate records. Therefore, we find that petitioner fraudulently failed to report the income she embezzled from Hughes in tax years 1980, 1981, 1982, and 1983, and is therefore liable for the additions to tax as determined *412 by respondent in his notice of deficiency, under sections 6653(b) and 6653(b)(1) and (2). D. Substantial Understatement of Income Tax Liability
Section 6661 imposes an addition to tax if there is a substantial understatement of income tax for any taxable year. The addition to tax will be made in an amount equal to 25 percent of the amount of any underpayment attributable to such understatement, for all such additions assessed after October 21, 1986. Sec. 6661(a); Parks v. Commissioner, 94 T.C. at 665. A substantial understatement is one which exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b). If petitioner's understatement is substantial, she will be liable for the addition to tax, unless either of the reduction provisions of section 6661(b)(2)(B) applies. The addition to tax will be reduced by that portion of the understatement which is attributable either to (1) a position adopted by the taxpayer for which substantial authority exists, sec. 6661(b)(2)(B)(i), or (2) any item with respect to which the taxpayer has made adequate disclosure of the relevant facts in the tax return or any statement *413 attached thereto, sec. 6661(b)(2)(B)(ii). Petitioner reported tax liability for 1982 and 1983 of $ 2,308 and $ 3,443, respectively. Therefore, it is a substantial understatement. Because petitioner had no substantial authority for her position, and because she made no disclosure of her embezzlement scheme on her tax returns as filed, petitioner is liable for the section 6661 addition to tax. To reflect our findings and conclusions herein, Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
*. 50 percent of the interest due on $ 862,525 and $ 1,386,598, respectively.↩
2. The account names and nos. were as follows: Rocshire, Inc., account no. 09679-00271; Rocshire Productions, account no. 1146-2-00057; and Rocshire Records, account no. 09674-01051.↩
3. 18 U.S.C. sec. 664↩. 4. 18 U.S.C. sec. 371↩.
5. The other debt was comprised of the following items: ↩
Accounts payable
$ 189,000
Taxes payable
5,328
Contracts payable
82,450
Total
$ 276,778
6. The total amount required by the corporation to finance its operations through December 31, 1983, was $ 6,333,111, determined as follows: ↩
Cash
$ 133,947  Other current assets
7,947
Other investments
293,848
Buildings and other
depreciable assets  (at cost)  1,128,634
Intangible assets
(at cost)  471,611
Other assets
11,300
Retained Earnings--deficit
4,285,824
Total
$ 6,333,111
7. Section 61(a)↩ states, in part, that "gross income means all income from whatever source derived."